## HAMM *v.* CITY OF ROCK HILL.

No. 2. Argued October 12, 1964.—Decided December 14, 1964.*

*Jack Greenberg* argued the cause for petitioner in No. 2. *Constance Baker Motley* argued the cause for petitioners in No. 5. With them on the brief were *James M. Nabrit III, Charles L. Black, Jr., Matthew J. Perry, Lincoln C. Jenkins, Donald James Sampson, Willie T. Smith, Jr., Harold B. Anderson, Wiley A. Branton, William T. Coleman, Jr.,* and *Marvin E. Frankel.*

*Together with No. 5, *Lupper et al.* v. *Arkansas,* on certiorari to the Supreme Court of Arkansas.

*Daniel R. McLeod,* Attorney General of South Carolina, argued the cause for respondent in No. 2. With him on the brief was *Everett N. Brandon,* Assistant Attorney General of South Carolina.

*Jack L. Lessenberry,* Chief Assistant Attorney General of Arkansas, argued the cause for respondent in No. 5. With him on the brief was *Bruce Bennett,* Attorney General of Arkansas.

MR. JUSTICE CLARK delivered the opinion of the Court.

These are "sit-in" cases that came here from the highest courts of South Carolina and Arkansas, respectively. Each of those courts affirmed convictions based upon state trespass statutes against petitioners, who are Negroes, for participating in "sit-in" demonstrations in the luncheon facilities of retail stores in their respective States. We granted certiorari in each of the cases, 377 U. S. 988, 989, and consolidated them for argument. The petitioners asserted both in the state courts and here the denial of rights, privileges, and immunities secured by the Fourteenth Amendment; in addition, they claim here that the Civil Rights Act of 1964, 78 Stat. 241, passed subsequent to their convictions and the affirmances thereof in the state courts, abated these actions.

1. *The Facts.*

In No. 2, *Hamm* v. *Rock Hill,* the petitioner, and a companion who is now deceased, entered McCrory's variety store at Rock Hill, South Carolina. After making purchases in other parts of the store, they proceeded to the lunch counter and sought service. It was refused. The manager asked the petitioner and his associate to leave and when they refused he called the police. They were prosecuted and convicted under § 16–388 of the S. C. Code of Laws, making it an offense for anyone to enter a place of business after having been warned not to do so

or to refuse to leave immediately after having entered therein. Petitioner's companion died subsequently. The conviction of petitioner was affirmed by both the Court of General Sessions and the Supreme Court of South Carolina, 241 S. C. 420, 128 S. E. 2d 907 (1962).

*Lupper v. Arkansas*, No. 5, involves a group of Negroes who entered the department store of Gus Blass Company in Little Rock. The group went to the mezzanine tearoom of the store at the busy luncheon hour, seated themselves and requested service which was refused. Within a few minutes the group, including petitioners, was advised that Blass reserved the right to refuse service to anyone and was not prepared to serve them at that time. Upon being requested to leave, the petitioners refused. The police officers who were summoned located petitioners on the first floor of the store and arrested them. The officers' testimony that petitioners admitted the whole affair was denied. The prosecutions in the Little Rock Municipal Court resulted in convictions of petitioners based upon § 41–1433, Ark. Stat. Ann. (1964 Repl. Vol.), which prohibits a person from remaining on the premises of a business establishment after having been requested to leave by the owner or manager thereof. On appeal to the Pulaski Circuit Court, a trial *de novo* resulted in verdicts of guilty and the Arkansas Supreme Court affirmed, 236 Ark. 596, 367 S. W. 2d 750 (1963), *sub nom. Briggs v. State.*

We hold that the convictions must be vacated and the prosecutions dismissed. The Civil Rights Act of 1964 forbids discrimination in places of public accommodation and removes peaceful attempts to be served on an equal basis from the category of punishable activities. Although the conduct in the present cases occurred prior to enactment of the Act, the still-pending convictions are abated by its passage.

## 2. *Application of Title II of the Civil Rights Act of 1964 to the Facts Here.*

We treat these cases as involving places of public accommodation covered by the Civil Rights Act of 1964. Under that statute, a place of public accommodation is defined to include one which serves or offers to serve interstate travelers. Applying the rules of §§ 201 (b) (2), (c)[1] we find that each of them offers to serve interstate travelers. In *Hamm* it is not denied that the lunch counter was in a McCrory's 5-and-10-cent store, a large variety store at Rock Hill belonging to a national chain, which offers to sell thousands of items to the public; that it invites all members of the public into its premises to do business and offers to serve all persons, except at its lunch counter which is restricted to white persons only. There is no contention here that it does not come within the Act. Likewise in *Lupper* the lunch counter area, called a tearoom, is located within and operated by the Gus Blass Company's department store at Little Rock. It is a large department store dealing extensively in interstate commerce. It appears from the record that it also offered to serve all persons coming into its store but limited its lunch counter service to white persons. On argument it was frankly admitted that the

---

[1] Section 201:

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce . . .

. . . . .

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment . . .

. . . . .

"(c) The operations of an establishment affect commerce within the meaning of this title if . . . it serves or offers to serve interstate travelers . . . ."

lunch counter operation "probably would" come under the Act. Finally, neither respondent asks for a remand to determine the facts as to coverage of the respective lunch counters.[2] In the light of such a record and the legislative history indicating that Congress intended to cover retail store lunch counters, see 110 Cong. Rec. 1519–1520, we hold that the Act covers both the McCrory and the Blass lunch counter operations.

3. *The Provisions of the Act.*

Under the Civil Rights Act, petitioners' conduct could not be the subject of trespass prosecutions, federal or state, if it had occurred after the enactment of the statute.

Title II includes several sections, some of which are relevant here, that create federal statutory rights.[3] The first is § 201 (a) declaring that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation," which as we have found includes the establishments here involved. Next, § 203 provides:

"No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 201 or 202, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or

---

[2] In *Lupper* the State's brief says, "a remand of these cases would not reap any . . . benefits." At 13.

[3] Some of us believe that the substantive rights granted by the Act here, i. e., freedom from discrimination in places of public accommodation are also included in the guarantees of the Fourteenth Amendment, see concurring opinions in *Bell* v. *Maryland*, 378 U. S. 226; others take the position that the Amendment creates no such substantive rights, see dissenting opinion in *Bell* v. *Maryland, supra.* No such question is involved here, and we do not pass upon it in any manner. We deal only with the statutory rights created in the Act.

privilege secured by section 201 or 202, or (c) *punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202.*" (Emphasis supplied.)

On its face, this language prohibits prosecution of any person for seeking service in a covered establishment, because of his race or color. It has been argued, however, that victims of discrimination must make use of the exclusive statutory mechanisms for the redress of grievances, and not resort to extralegal means. Although we agree that the law generally condemns self-help, the language of § 203 (c) supports a conclusion that nonforcible attempts to gain admittance to or remain in establishments covered by the Act, are immunized from prosecution, for the statute speaks of exercising or attempting to exercise a "right or privilege" secured by its earlier provisions. The availability of the Act as a defense against punishment is not limited solely to those who pursue the statutory remedies. The legislative history specifically notes that the Act would be a defense to criminal trespass, breach of the peace and similar prosecutions. Senator Humphrey, floor manager of the bill in the Senate, said in explaining the bill:

> "This plainly means that a defendant in a criminal trespass, breach of the peace, or other similar case can assert the rights created by 201 and 202 and that State courts must entertain defenses grounded upon these provisions. . . ." 110 Cong. Rec. 9767.

In effect the Act prohibits the application of state laws in a way that would deprive any person of the rights granted under the Act. The Supremacy Clause, Art. VI, cl. 2, requires this result where "there is a clear collision" between state and federal law, *Kesler* v. *Department of Safety,* 369 U. S. 153, 172 (1962), or a conflict between

federal law and the application of an otherwise valid state enactment, *Hill* v. *Florida,* 325 U. S. 538 (1945). There can be no question that this was the intended result here in light of § 203 (c). The present convictions and the command of the Civil Rights Act of 1964 are clearly in direct conflict. The only remaining question is the effect of the Act on judgments rendered, but not finalized, before its passage.

### 4. *Effect of the Act upon the Prosecutions.*

Last Term, in *Bell* v. *Maryland,* 378 U. S. 226, we noted the existence of a body of federal and state law to the effect that convictions on direct review at the time the conduct in question is rendered no longer unlawful by statute, must abate. We consider first the effect the Civil Rights Act would have on petitioners' convictions if they had been federal convictions, and then the import of the fact that these are state and not federal convictions. We think it is clear that the convictions, if federal, would abate.

The doctrine found its earliest expression in Chief Justice Marshall's opinion in *United States* v. *Schooner Peggy,* 1 Cranch 103, 110 (1801):

> "But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional . . . I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns . . . [the law] ought always to receive a construction conforming to its manifest import . . . . In such a case the court must decide according to existing laws, and if it

be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

Although the decision in that case arguably rested on the premise that appeals in admiralty were trials *de novo,* and that prize litigation applied the law of the time of trial, see *Yeaton* v. *United States,* 5 Cranch 281, 283 (1809); *Maryland* v. *Baltimore & O. R. Co.,* 3 How. 534, 552 (1845); *United States* v. *Tynen,* 11 Wall. 88, 95 (1871); *United States* v. *Reisinger,* 128 U. S. 398, 401 (1888); *United States* v. *Chambers,* 291 U. S. 217, 222–223 (1934); *Massey* v. *United States,* 291 U. S. 608 (1934), the later cases applied the rule in quite different contexts, see *United States* v. *Tynen, supra; United States* v. *Reisinger, supra.* The reason for the rule was stated by Chief Justice Hughes, in *United States* v. *Chambers:* "Prosecution for crimes is but an application or enforcement of the law, and if the prosecution continues the law must continue to vivify it." 291 U. S. 217, at 226. Although *Chambers* specifically left open the question of the effect of its rule on cases where final judgment was rendered prior to ratification of the Twenty-first Amendment, and petition for certiorari sought thereafter, such an extension of the rule was taken for granted in the *per curiam* decision in *Massey* v. *United States, supra,* handed down shortly after *Chambers.*

It is apparent that the rule exemplified by *Chambers* does not depend on the imputation of a specific intention to Congress in any particular statute. None of the cases cited drew on any reference to the problem in the legislative history or the language of the statute. Rather, the principle takes the more general form of imputing to Congress an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive. This general principle, expressed in the rule, is to be read wher-

ever applicable as part of the background against which Congress acts. Thus, we deem it irrelevant that Congress made no allusion to the problem in enacting the Civil Rights Act.

Nor do we believe that the provisions of the federal saving statute, 61 Stat. 635, 1 U. S. C. § 109 (1958 ed.), would nullify abatement of a federal conviction. In *Chambers,* a case where the cause for punishment was removed by a repeal of the constitutional basis for the punitive statute, the Court was quite certain as to this. See 291 U. S., at 224 and n. 2, involving the identical statute. The federal saving statute was originally enacted in 1871, 16 Stat. 432. It was meant to obviate mere technical abatement. such as that illustrated by the application of the rule in *Tynen* decided in 1871. There a substitution of a new statute with a greater schedule of penalties was held to abate the previous prosecution. In contrast, the Civil Rights Act works no such technical abatement. It substitutes a right for a crime. So drastic a change is well beyond the narrow language of amendment and repeal. It is clear, therefore, that if the convictions were under a federal statute they would be abated.

We believe the fact that the convictions were under state statutes is in these cases a distinction without a difference.[4] We cannot believe the Congress, in enacting such a far-reaching and comprehensive scheme, intended the Act to operate less effectively than the run-of-

---

[4] In *Bell* v. *Maryland, supra,* we dealt with the problem arising when a state enactment intervened prior to the finalizing of state criminal trespass convictions. Because we were dealing with the effect of a state statute on a state conviction prior to the Act's passage we felt that the state courts should be allowed to pass on the question. Here, we have an intervening federal statute and in attempting to judge its effect on a state conviction we are faced with a federal not a state question. Because of this distinction we do not feel that remand is required or desirable.

the-mill repealer. Since the provisions of the Act would abate all federal prosecutions it follows that the same rule must prevail under the Supremacy Clause which requires that a contrary state practice or state statute must give way. Here the Act intervened before either of the judgments under attack was finalized. Just as in federal cases abatement must follow in these state prosecutions. Rather than a retroactive intrusion into state criminal law this is but the application of a long-standing federal rule, namely, that since the Civil Rights Act substitutes a right for a crime any state statute, or its application, to the contrary must by virtue of the Supremacy Clause give way under the normal abatement rule covering pending convictions arising out of a pre-enactment activity. The great purpose of the civil rights legislation was to obliterate the effect of a distressing chapter of our history. This demands no less than the application of a normal rule of statutory construction to strike down pending convictions inconsistent with the purposes of the Act.

Far from finding a bar to the application of the rule where a state statute is involved, we find that our construction of the effect of the Civil Rights Act is more than statutory. It is required by the Supremacy Clause of the Constitution. See *Kesler* v. *Department of Safety,* 369 U. S. 153, 172 (1962); *Hill* v. *Florida,* 325 U. S. 538 (1945). Future state prosecutions under the Act being unconstitutional and there being no saving clause in the Act itself, convictions for pre-enactment violations would be equally unconstitutional and abatement necessarily follows.

Nor do we find persuasive reasons for imputing to the Congress an intent to insulate such prosecutions. As we have said, Congress, as well as the two Presidents who recommended the legislation, clearly intended to eradicate an unhappy chapter in our history. The peaceful conduct for which petitioners were prosecuted was on behalf

of a principle since embodied in the law of the land. The convictions were based on the theory that the rights of a property owner had been violated. However, the supposed right to discriminate on the basis of race, at least in covered establishments, was nullified by the statute. Under such circumstances the actionable nature of the acts in question must be viewed in the light of the statute and its legislative purpose.

We find yet another reason for applying the *Chambers* rule of construction. In our view Congress clearly had the power to extend immunity to pending prosecutions. Some might say that to permit these convictions to stand would have no effect on interstate commerce which we have held justified the adoption of the Act. But even if this be true, the principle of abatement is so firmly imbedded in our jurisprudence as to be a necessary and proper part of every statute working a repealer of criminal legislation. Where Congress sets out to regulate a situation within its power, the Constitution affords it a wide choice of remedies. This being true, the only question remaining is whether Congress exercised its power in the Act to abate the prosecutions here. If we held that it did not we would then have to pass on the constitutional question of whether the Fourteenth Amendment, without the benefit of the Civil Rights Act, operates of its own force to bar criminal trespass convictions, where, as here, they are used to enforce a pattern of racial discrimination. As we have noted, some of the Justices joining this opinion believe that the Fourteenth Amendment does so operate; others are of the contrary opinion. Since this point is not free from doubt, and since as we have found Congress has ample power to extend the statute to pending convictions we avoid that question by favoring an interpretation of the statute which renders a constitutional decision unnecessary.

In short, now that Congress has exercised its constitutional power in enacting the Civil Rights Act of 1964 and declared that the public policy of our country is to prohibit discrimination in public accommodations as therein defined, there is no public interest to be served in the further prosecution of the petitioners. And in accordance with the long-established rule of our cases they must be abated and the judgment in each is therefore vacated and the charges are ordered dismissed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, whom MR. JUSTICE GOLDBERG joins, concurring.

Some of my Brethren raise constitutional doubts about the power of Congress to nullify the convictions of sit-in demonstrators for violation of state trespass laws prior to the passage of the Civil Rights Act of 1964. My Brother HARLAN observes that it is difficult to see, in the absence of any evidence in the legislative record of the Act, how "giving effect to *past* state trespass convictions would result in placing any burden on *present* interstate commerce," *post,* p. 325. I merely note here that, in joining the opinion of the Court, I am faced with no such difficulty. That is because, as my Brother GOLDBERG and I said in our respective concurring opinions in *Heart of Atlanta Motel, Inc.* v. *United States, ante,* pp. 291, 279, Congress has, in passing this Act, not merely sought to remove burdens from interstate commerce; it has also sought to protect and enforce the Fourteenth Amendment right to be free of discriminatory treatment, based on race, in places of public accommodation. It is certainly not difficult to see how Congress could appropriately conclude that all state interference with the exercise of this right should come to a halt on the passage of the Act, that the States should not be permitted to insist on punishing one whose only "crime" was assertion of a consti-

tutional right, albeit prior to the enactment of the present legislation, and that this Court should not put its imprimatur on such state prosecutions, whenever they arose.

MR. JUSTICE BLACK, dissenting.

The Civil Rights Act of 1964, validly, I think,[1] made it unlawful for certain restaurants thereafter to refuse to serve food to colored people because of their color. The Court now interprets the Act as a command making it unlawful for the States to prosecute and convict "sit-in" demonstrators who had violated valid state trespass laws prior to passage of the federal Act. The idea that Congress has power to accomplish such a result has no precedent, so far as I know, in the nearly 200 years that Congress has been in existence.

The record shows that the two petitioners in *Lupper,* No. 5, were part of a group of persons who went to a department store tearoom, seated themselves at tables and at the counter as part of a "sit-in" demonstration, and refused to leave when asked to do so. The Court says that this conduct "could not be the subject of trespass prosecutions, federal or state, if it had occurred after the enactment of the statute." I do not understand from what the Court says that it interprets those provisions of the Civil Rights Act which give a right to be served without discrimination in an establishment which the Act covers [2] as also authorizing persons who are unlawfully refused service a "right" to take the law into their own hands by sitting down and occupying the premises for as long as they choose to stay. I think one of the chief purposes of the 1964 Civil Rights Act was to take such dis-

---

[1] See my concurring opinion in *Heart of Atlanta Motel, Inc.* v. *United States, ante,* p. 268.

[2] Sections 201–203, 78 Stat. 243–244, 42 U. S. C. §§ 2000a—2000a–2 (1964 ed.).

putes out of the streets and restaurants and into the courts, which Congress has granted power to provide an adequate and orderly judicial remedy.

Even assuming, however, that the Civil Rights Act was intended to let people who enter restaurants take the law into their own hands by forcibly remaining when service is refused them, this would be no basis for holding that Congress also meant to compel States to abate convictions like these for lawless conduct occurring before the Act was passed. See *Bell* v. *Maryland*, 378 U. S. 226, 318 (dissenting opinion). The judge-made "common law rule" of construction on which the Court relies has been applied heretofore only where there was a repeal of one statute by another—not, as my Brother HARLAN points out, where as here a later law passed by Congress places certain restrictions on the operation of the still valid law of a State. But even if the old common-law rule of construction taken alone would otherwise have abated these convictions, Congress nearly a century ago passed a "saving" statute, 1 U. S. C. § 109 (1958 ed.), to keep courts from imputing to it an intent to abate cases retroactively, unless such an intent was expressly stated in the law it passed. That statute says:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. . . ."

The purpose of this statute is plain on its face—it was to prevent courts from imputing to Congress an intent which Congress never entertained. This was broad, remedial legislation, see *Great Northern R. Co.* v. *United*

*States,* 208 U. S. 452; *United States* v. *Reisinger,* 128 U. S. 398; *United States* v. *Ulrici,* 3 Dillon 532, 28 Fed. Cas. 328 (No. 16,594) (C. C. E. D. Mo.) (opinion of Mr. Justice Miller on circuit), and by any fair reading it is broad enough to wipe out any and every application of the common-law rule which it was designed to do away with, unless judge-made rules of construction have some sort of superiority over congressionally enacted statutes.[3] In *United States* v. *Chambers,* 291 U. S. 217, and *Massey* v. *United States,* 291 U. S. 608, the only cases which the Court cites as authority for disregarding the federal saving statute, this Court made clear that the saving statute was not involved in any way since the abatement there was by force of the Twenty-first Amendment, and of course an amendment to the Constitution supersedes an Act of Congress. See 291 U. S., at 223–224. By today's discovery of a "long-established rule of our cases," the Court has now put back on Congress the burden of spelling out expressly, statute by statute, in laws passed hereafter that it does not want to upset convictions for past crimes, a burden which Congress renounced nearly 100 years ago and which it did not know it had when it passed the 1964 Act.

Furthermore, I have grave doubt about the power of Congress acting under the Commerce Clause and the Necessary and Proper Clause to take the unprecedented step of abating these past state convictions. Yet the

---

[3] The Court says that:

"The federal saving statute was originally enacted in 1871, 16 Stat. 432. It was meant to obviate mere technical abatement such as that illustrated by the application of the rule in *Tynen* decided in 1871. There a substitution of a new statute with a greater schedule of penalties was held to abate the previous prosecution." *Ante,* p. 314. There is no support for this statement in the language of the statute, in its legislative history, or in subsequent decisions under it.

Court judicially declares that "there is no public interest to be served" in upholding the convictions of these trespassers, a conclusion of policy which I had thought was only for legislative bodies to decide. See *Ferguson* v. *Skrupa,* 372 U. S. 726.

In the early days of this country this Court did not so lightly intrude upon the criminal laws of a State. In *Cohens* v. *Virginia,* 6 Wheat. 264, 443, decided in 1821, Chief Justice John Marshall speaking for the Court said:

> "To interfere with the penal laws of a State, where they are not levelled against the legitimate powers of the Union, but have for their sole object the internal government of the country, is a very serious measure, which Congress cannot be supposed to adopt lightly, or inconsiderately. The motives for it must be serious and weighty. It would be taken deliberately, and the intention would be clearly and unequivocally expressed.
>
> "An act, such as that under consideration, ought not, we think, to be so construed as to imply this intention, unless its provisions were such as to render the construction inevitable."

Nothing in the language or history of the 1964 Act makes the Court's reading into it of a purpose to interfere with state laws "inevitable" or even supportable, nor in any way justifies the Court's offhand assertion that it is carrying out the "legislative purpose." For I do not find one paragraph, one sentence, one clause, or one word in the 1964 Act on which the most strained efforts of the most fertile imagination could support such a conclusion. And in what is perhaps the most extensive and careful legislative history ever compiled, dealing with one of the most thoroughly discussed and debated bills ever passed by Congress, a history including millions and millions of words written on tens of thousands of pages contained in

volumes weighing well over half a hundred pounds, in which every conceivable aspect and application of the 1964 Act were discussed *ad infinitum,* not even once did a single sponsor, proponent or opponent of the Act intimate a hope or express a fear that the Act was intended to have the effect which the Court gives it today.

Mr. Justice Harlan, dissenting.

The Court holds that these state trespass convictions, occurring before the passage of the Civil Rights Act of 1964, must be set aside by virtue of the federal doctrine of criminal abatement. This remarkable conclusion finds no support in reason or authority.

The common-law rule of abatement is basically a canon of construction conceived by the courts as a yardstick for determining whether a legislature, which has enacted a statute making conduct noncriminal which was proscribed by an earlier criminal statute, also intended to put an end to nonfinal convictions under the former legislation. In effect, the doctrine of abatement establishes a presumption that such was the purpose of the legislature in the absence of a demonstrated contrary intent, as evidenced, for example, in the case of congressional enactments by the federal saving statute,[1] see *United States*

---

[1] 1 U. S. C. § 109 (1958 ed.):

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any

v. *Reisinger,* 128 U. S. 398. As was said in *United States*
v. *Tynen,* 11 Wall. 88, 95:

> "By the repeal of the 13th section of the act of
> 1813 all criminal proceedings taken under it fell.
> There can be no legal conviction, nor any valid judg-
> ment pronounced upon conviction, unless the law
> creating the offence be at the time in existence. By
> the repeal the legislative will is expressed that no
> further proceedings be had under the act repealed."

The doctrine has its origins in the English common law,
see, *e. g., Rex* v. *Cator,* 4 Burr. 2026, 98 Eng. Rep. 56;
*King* v. *Davis,* 1 Leach Crown Cases 306 (3d ed.), 168
Eng. Rep. 238, and has been embraced in American state
and federal jurisprudence.

The abatement doctrine serves a useful and appropriate
purpose in a framework of the legislation of a *single* polit-
ical sovereignty. The doctrine strikes a jarring note,
however, when it is applied so as to affect the legislation
of a *different* sovereignty, as the federal doctrine is now
used to abate these state convictions. Our federal system
tolerates wide differences between state and federal legis-
lative policies,[2] and the presumption of retroactive excul-

---

proper action or prosecution for the enforcement of such penalty,
forfeiture, or liability."

I accept the Court's conclusion that this section has no application
here, but only because there has been no repeal or amendment of an
existing *federal* statute.

[2] Arkansas, for example, has a saving clause, Ark. Stat. Ann.
§§ 1–103, 1–104, similar to 1 U. S. C. § 109, which expresses a state
policy to save the conviction of Lupper. See *Mack* v. *Connor,* 220
Ga. 450, 139 S. E. 2d 286 (1964). Cf. *Bell* v. *Maryland,* 378 U. S. 226,
conviction affirmed on remand, 236 Md. 356, 204 A. 2d 54; rehearing
granted and argument deferred "awaiting the outcome of similar
issues now pending before the United States Supreme Court," quite
obviously referring to these cases.

.pation that readily attaches to a federal criminal statute which unreservedly repeals earlier federal legislation cannot, in my opinion, be automatically thought to embrace exoneration from earlier wrongdoing under a state statute.[3]

I know of no case which suggests that the doctrine of abatement can be applied to affect the existing legislation of another jurisdiction. Until today the doctrine has always been applied only with respect to legislation of the *same* sovereignty, *e. g., Rex* v. *Cator, supra; King* v. *Davis, supra; United States* v. *Tynen, supra; Yeaton* v. *United States,* 5 Cranch 281. And all of the cases relied on by the Court are of that character.

The Supremacy Clause cannot serve as a vehicle for extending the federal doctrine of abatement beyond proper bounds. That provision of the Constitution would come into play only if it appeared from the Civil Rights Act itself or from its legislative history and setting that Congress' purpose was to displace past as well as prospective applications of state laws touching upon the matters with which the federal statute is concerned. For me, this would have to be made to appear in unmistakable terms, for such a purpose would represent an exercise of federal legislative power wholly unprecedented in our history.

I entirely agree with my Brother BLACK's poignant observations on this score; there is not a scintilla of evidence which remotely suggests that Congress had any such revolutionary course in mind. Section 1104 of the Civil Rights Act indeed provides that nothing in the statute is to be "construed as invalidating any provision of State law unless . . . inconsistent with any of the pur-

---

[3] See *Cohens* v. *Virginia,* 6 Wheat. 264, 443, quoted in my Brother BLACK's opinion, *ante,* p. 321.

poses of this Act, or any provision thereof." Whether or not state trespass laws as applied to "racial trespasses" occurring *after* the effective date of the Civil Rights Act are to be deemed inconsistent with the provisions of § 203 (c) of the Act,[4] a question which I find unnecessary to decide at this juncture, there is certainly no such plain inconsistency between § 203 (c) and state trespass laws as applied in those situations arising *before* the passage of the Civil Rights Act as would justify this Court's attributing to Congress a purpose to pre-empt state law in such instances.

Moreover, the contrary conclusion would confront us with constitutional questions of the gravest import, for the legislative record is barren of any evidence showing that giving effect to *past* state trespass convictions would result in placing any burden on *present* interstate commerce.[5] Such evidence, at the very least, would be a prerequisite to the validity of any purported exercise of the Commerce power in this regard. See *Heart of Atlanta Motel, Inc.* v. *United States, ante,* p. 241; *Katzenbach* v. *McClung, ante,* p. 294. There is, indeed, nothing to indicate that Congress even adverted to such a question.

Finally, the Court's decision cannot be justified under the rule of avoidance of constitutional questions, see Court's opinion, *ante,* p. 316. That rule does not reach to the extent of enabling this Court to fabricate nonconstitutional grounds of decision out of whole cloth.

" 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.' *United States* v. *Jin Fuey Moy, supra* [241 U. S. 394, 401]. But avoidance of a difficulty will not

---

[4] Quoted in the Court's opinion, *ante,* pp. 310–311.

[5] No attempt is made by the Court to justify the retroactive application of the Civil Rights Act under the Fourteenth Amendment.

be pressed to the point of disingenuous evasion."
*Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379
(Cardozo, J.).[6]

Concluding that these trespass convictions are not
abated, I would affirm the judgments in both of these
cases for the reasons given by MR. JUSTICE BLACK in his
dissenting opinion in *Bell* v. *Maryland,* 378 U. S. 226,
318, in which I joined.

MR. JUSTICE STEWART, dissenting.

The chief difference between these cases and *Bell* v.
*Maryland,* 378 U. S. 226, is that here federal rather than
state legislation has intervened while the convictions were
under review.   As I understand the Court's opinion, it
first asserts that, if these had been federal convictions, the
passage of the Civil Rights Act would have abated them
under principles of federal decisional law.   It then pro-
ceeds to apply those asserted principles to these state
convictions through the Supremacy Clause of the Con-
stitution.   If I thought that Congress had provided that
such nonfinal state convictions are to be abated, I would
find no constitutional difficulty in joining the Court's dis-
position of these cases under the Supremacy Clause.   But
Congress was silent on the subject, and I am unable to
subscribe to the Court's reasoning.

In *Bell* v. *Maryland,* we said that a State's abatement
policy was for the State to determine.   Arkansas and
South Carolina might hold that this supervening federal
legislation provides a compelling reason to abate these
proceedings, but I can find nothing in the legislation or in
the Constitution which requires these States to do so.

We found in *Bell* that the law of Maryland was "open
and arguable" on the issue of abatement.   The law of

---

[6] See also *International Association of Machinists* v. *Street,* 367
U. S. 740, 797 (Frankfurter, J., dissenting).

Arkansas and South Carolina is no clearer. Like Maryland, Arkansas has a saving statute similar to the federal counterpart. And like Maryland, South Carolina apparently has a policy favoring abatement when state criminal statutes are repealed while prosecutions are pending. See *State* v. *Spencer,* 177 S. C. 346, 181 S. E. 217.

For the reasons stated in the Court's opinion in *Bell* v. *Maryland,* I would vacate the judgments and remand the cases to the state courts for reconsideration in the light of the supervening federal legislation.

Mr. Justice White, dissenting.

Absent the Civil Rights Act there was, in my view, no constitutional infirmity in the state court convictions. *Bell* v. *Maryland,* 378 U. S. 226, 318 (dissenting opinion of Mr. Justice Black). And if Congress had the power to abate these convictions I am confident it had no intent of exercising it by passing the new law. There is nothing but silence to indicate that Congress meant to void outstanding judgments of state courts. I would not, for several reasons, read so much into nothing as the Court attempts to do.

It is wrong to impute to the silence of Congress an unusual and unprecedented step which at the very least poses constitutional problems of some import. By the time the Act was passed, *Bell* v. *Maryland, supra,* had forcefully raised the whole question of the status of previous convictions after a change in the law. I cannot believe, with that case on the books, remitting the matter to the state courts as it did, Congress would have left unstated its intention to erase all state court trespass judgments then on appeal in the courts. Moreover, the common-law presumption of abatement was reversed by 1 U. S. C. § 109 (1958 ed.), which stands as the most relevant indicator of congressional intention in situations like this. Congressional silence in these circumstances

seems to me to point to the conclusion exactly opposite to that reached by the Court.

Finally, had Congress intended to ratify massive disobedience to the law, so often attended by violence, I feel sure it would have said so in unmistakable language. The truth is that it is only judicial rhetoric to blame this result upon Congress. Given a discernable congressional decision, I would be happy to follow it, as it is our task to do, absent constitutional limitations. But without it we have another case. Whether persons or groups should engage in nonviolent disobedience to laws with which they disagree perhaps defies any categorical answer for the guidance of every individual in every circumstance. But whether a court should give it wholesale sanction is a wholly different question which calls for only one answer.