173 So.2d 817

**Gerald JOHNSON**

v.

**STATE.**

**7 Div. 720.**

Court of Appeals of Alabama.

April 7, 1964.

Rehearing Denied April 29, 1964.

On Remandment March 30, 1965.

**612**

Arthur D. Shores, Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., and Winston Huddleston, Sp. Asst. Atty. Gen., for the State.

CATES, Judge.

This is an appeal from a so-called "kneel-in."

The judgment below must be reversed on a technical lack of proof of authority in the minister to order the visitors from the church.

The complaint (see Code 1940, T. 14, § 426; T. 15, § 259, Form No. 109) reads:

"Comes the State of Alabama by its Solicitor and complains of Gerald Johnson that said County and within twelve months before the commencement of this prosecution, said Gerald Johnson, on to-wit: the 22nd day of April, 1962, having entered into the First Wesleyan Methodist Church of Talladega, Alabama, Inc., or on the premises of said Church located at, to-wit: 431 East Street North, Talladega, Alabama, failed or refused, without legal cause or good excuse, to immediately leave upon being ordered or requested to do so by John W. Vess, or the person in possession, his agent or representative, against the peace and dignity of the State of Alabama."

The offense charged falls within Code 1940, T. 14, § 426, the second alternative, which reads:

"* * * any person, who, having entered into * * * or on the premises of another without having been warned within six months not to do so, and fails or refuses, without legal cause or good excuse, to leave immediately on being ordered or requested to do so by the person in possession, his agent or representative, shall, on conviction, be fined not more than one hundred dollars, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than three months."

▆▆▆ The alternative in this section, to paraphrase Harwood, P. J., in Baxter v. State, 41 Ala.App. 499, 137 So.2d 57, has for constituent elements: (1) an entry without prior warning and (2) failure to leave on request. This request can be given only by "the person in possession, his agent or representative." The authority to warn off is strictly scrutinized. Templin v. State, 159 Ala. 128, 48 So. 1027; Arrington v. State, 168 Ala. 143, 52 So. 928.

▆▆▆ There must be evidence to show that the averred owner is in possession. Matthews v. State, 81 Ala. 66, 1 So. 43. Also the request to leave must be made by the "person in possession, his agent, or representative." Central Iron & Coal Co. v. Wright, 20 Ala.App. 82, 101 So. 815; Edelman v. City of Gadsden, 16 Ala.App. 381, 77 So. 914.

Bearing this in mind, our examination is directed primarily to whether or not the minister was authorized, *under the evidence*, to request the defendant to leave the church. Simpson, J., in Woodruff v. State, 170 Ala. 2, 54 So. 240, points out the agent must be shown to be clothed with "authority to warn parties from trespassing."

This court, per Samford, J., in Huff v. State, 16 Ala.App. 345, 77 So. 939, said of § 426, supra:

"* * * The possession of a church is as much protected as that of an individual, but the possession of the church must be proven as any other fact in the case. The fact of possession having been proven, the warning to the defendant to keep off must be proven, and that it was given by those having the authority to do so. The church, in giving the warning, must act through its duly constituted officers. This proof can be made either directly or by such facts and circumstances as would warrant the jury in arriving at the conclusion that the warning had been given and by the proper authority. * * *"

## I.

### Corporate Agency of "Minister"

�no The use of the abbreviation "Inc." in the church's name for "Incorporated" can fairly import corporate character and no issue being raised thereon in the trial, corporate existence will be intended. Barksdale v. Strickland & Hazard, 220 Ala. 86, 124 So. 234; Southside Bank v. Birmingham Truth, 221 Ala. 143, 128 So. 130; cf. Shepherd v. Birmingham Trust & Savings Co., 233 Ala. 320, 171 So. 906. No sworn plea denying corporation was filed under Code 1940, T. 15, § 315, and hence the State was not required to make proof on this part of the charge against the defendant. West v. State, 168 Ala. 1, 53 So. 277.

What was the authority of John W. Vess —undisputedly the only person who requested defendant to leave the premises— to act for the corporation?

Vess's testimony was that he was minister of the First Wesleyan Methodist Church of Talladega. No evidence was given of the express or implied power of a minister under any statement of general discipline of the denomination, if any, or of the congregational articles of incorporation or by laws or articles of association of the ecclesiastical society. No effort was made to show that the secular corporation held title for the benefit of an ecclesiastical body.

The power to exclude from membership is not before us. Chapman v. American Legion, 244 Ala. 553, 14 So.2d 225, 147 A.L.R. 585. Nor do we speculate on the extent of separation of Church and State.

Central Iron & Coal Co. v. Wright, supra, was a malicious prosecution and false imprisonment action because a corporate agent, also a special deputy, after giving warning, arrested Wright, a discharged employee, for refusing to leave a company house. There was evidence to show the agent was acting thereabouts in the line of his duty and about his master's business.

The Supreme Court, per Sayre, J., in Ex parte Central Iron Co., 212 Ala. 130, 101 So. 824, in denying certiorari, relying on City Delivery Co. v. Henry, 139 Ala. 161, 34 So. 389, said:

"* * * the evidence went to show, as the Court of Appeals states, that after defendant's agent had arrested plaintiff he took plaintiff before a magistrate, swore out a warrant against him, and lodged him in jail. Thereafter the agent consulted with the 'regular attorney' of defendant, who, we think, may be considered as defendant's vice principal in the legal department of its business—that is, as its attorney regularly employed to care for any legal business in which defendant might be interested—and the attorney thereafter appeared in court and prosecuted plaintiff before the court on the charge of trespass to property, the charge on which the agent had arrested him and the charge preferred against him in the warrant sworn out before the magistrate. From these facts the jury were authorized to infer a ratification of the act of the agent, and upon such ratification may have founded the conclusion of direct corporate action as alleged in the third count of the complaint. * * *"

The Supreme Court pointed out that being in the line of regular duties alone did not evidence the agent's being the "alter ego" or "vice principal" of the corporation:

" * * * But the facts stated fall far short of constituting the * * * agent the vice principal of the defendant as those terms may be properly used with reference to the subject-matter of discussion; there was, we may infer from the court's statement of facts, no general managerial authority conferred upon the agent; nor was he at the head of any department of defendant's business with managerial authority. He was nothing more than an employee; he was therefore not a vice principal * * *."

## II.

### Ecclesiastical Authority of "Minister"

What inherent power can we infer from the Rev. Mr. Vess's being the minister? Cyclopedic Law Dictionary defines "minister" in Ecclesiastical Law as "One ordained by some church to preach the Gospel."

This definition furnishes no clue to other authority belonging to this church office. Various sects separate or concentrate the conduct of their affairs and worship so much that we would be rash were we to call on our own knowledge. Moreover, this question being at least partly ecclesiastical may be constitutionally beyond competence of the civil courts.

The Supreme Court of Iowa has held that a member of the session of a Presbyterian church—not the pastor—was, under evidence which included excerpts from the Westminster Assembly's Confession of Faith, such a spiritual officer as to be a "minister." This under a statute relating to privileged communications. The opinion (Reutkemeier v. Nolte, 179 Ia. 342, 161 N.W. 290, L.R.A.1917D, 273) states:

" * * * What is a 'minister of the gospel' within the meaning of this statute? The law as such sets up no standard or criterion. That question is left wholly to the recognition of the 'denomination.' The word 'minister,' which in its original sense meant a mere servant, has grown in many directions and into much dignity. Few English words have a more varied meaning. In the religious world it is often, if not generally, used as referring to a pastor of the church and a preacher of the gospel. This meaning, however, is not applicable to all Christian denominations. Some of them have no pastors and recognize no one as a minister in that sense, and yet all denominations recognize the spiritual authority of the church and provide a source of spiritual advice and discipline. * * *"

The only evidence of the Rev. Mr. Vess having authority with respect to the reception of the defendant came from his testimony. He first stated the Board of Stewards was the controlling body of the church.

On redirect, Vess testified:

"Q I'll ask you now at your particular church had you formulated any plan whereby these students would be received or denied?

"A Well, we had heard that they were trying to come to the churches or sit in at the churches or kneel-in, whatever they call it, and I had talked to the Stewards of the church and I gave them my opinion of the thing, that what I felt should be done. I felt like they were coming for publicity and I felt like the best way to defeat their purpose was not to give them publicity and so I had stated on a previous Sunday, probably two weeks before this time, or maybe it was on Palm—I think it was two weeks before this Sunday—I had told the congregation that was there the fact of what we had heard, and they had heard it too, and I said if there are students that come this is what we propose to do, and when they come the usher will ask them to wait at the door and that is what our usher did, and they will ask them to wait at the door and they will let me know and I'll come

back and talk to the students and after talking with them if they want to come in and sit down and worship, then I will come in and tell the congregation that we have Negro visitors and that I am going to seat them and that I will personally bring them down the aisle and seat them myself, *and if there were any ones [of the congregation] that didn't like it, they could get up and leave the service and we would go on.* That was our plans, and had they stopped at the request of our usher at the door that is what would have been done.

"Q  Now, after they—in other words, you told us they came right by your usher?

"A  That's right.

"Q  And then I believe you testified then that is when the confusion began to take place or when it started?

"A  Our usher requested them to stop at the door and wait that I wanted to speak to them and they paid no attention to him; in fact they just pushed right on into the church, just came right on in very hurriedly from what he told me."

When the defendant got into the sanctuary, Vess was in the church yard waiting for the ushers to bring the defendant to him to be interviewed as to the purpose of his visit. However, members of the congregation started to walk out. Vess then abandoned the plan and went back, entered the chancel, and asked the defendant to leave.

On cross, Vess testified:

"Q  You said you had planned if they had waited, you had planned to escort them and seat them yourself and then go up and tell them you had some visitors here?

"A  No, I was planning to tell the congregation they were there and then I was planning to seat them.

"Q  But after they seated themselves you didn't tell the congregation that they were there?

"A  Well, I didn't have to tell the congregation they were there; they could see it.

"Q  You didn't go up—

"A  (interrupting) Well they hardly gave me an opportunity.  I was so busy on the outside trying to keep some of them from going in and dragging them out that I didn't have time to run down and welcome them.

"Q  And you finally requested Lt. Morris to take over for their protection?

"A  Well, that was my intent that I felt it was for their good more than anyone else's.  I would rather have it handled that way than have somebody come in and drag them down the aisle and maybe hurt them or kill them.
*  *  *

"Q  And again for the record you say you didn't know anything about the trespass law?

"A  Well, I knew that, I mean I certainly recognized that when I felt that I had done what I could do and something more needed to be done for their own good and everybody's good  *  * but as far as what they would be charged with I did not know at that time."

When the plan went awry, Mr. Vess asked a police lieutenant for advice.

The minister's authority was only to receive the defendant.  Evidence showing submission of the plan for sanction of the stewards would seem to imply that this board was the sole source of authority.  76 C.J.S. Religious Societies, § 44.

### III.

### Conclusion

█  Without more evidence, we cannot say that, like an Anglican parish priest, the

minister was a corporation sole. Nor do we find proof of his being the church's "alter ego" or "vice principal."

We do not doubt that the sovereign authority of a particular congregation, whether board, wardens, bishop, presbytery, ruling elders, council, consistory or the congregation itself, extends to designating the manner in which nonmembers may be admitted into communing or into membership. But, as a matter of law, without help of proof in each particular case, we cannot assume in whom this power is reposed. To say that a person is a minister of the gospel, cannot be taken to mean that ordination confers any inherently greater power to admit or exclude than belongs to any other church member in good standing. Hundley v. Collins, 131 Ala. 234, 32 So. 575.

Seemingly, the Legislature had this enigmatic evidentiary problem in mind when it enacted Act No. 533 (S. 116—Hornsby), approved September 16, 1963, which reads in part:

"Section 1. Any person who having been specifically requested not to enter a church of which he is not a member or not to go upon premises of such church by an usher, preacher, minister or not to go upon premises of such church; or for a person to fail or refuse to leave such church or the premises of such church when specifically requested to leave by an usher, preacher, minister or other authorized officer of such church, shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one thousand dollars or by sentence to hard labor for the county where convicted for not more than one year, or both.

"Section 2. This Act shall not apply to police officers, highway engineers [sic], or other state or local officers in the performance of an official duty.

\* \* \* \* \* \*

"Section 4. The provisions of this Act are severable. If any part of the Act is declared invalid or unconstitutional, such declaration shall not affect the part which remains."

However, the instant claimed trespass was made Easter Sunday, 1962. Alabama Constitution 1901, § 22 (no ex post facto laws), thus keeps Act No. 533, supra, from applying. Moreover, since the title of Act No. 533 is narrower than the body, proof of express or necessarily implied authorization would still seem requisite in all cases. See Long v. State, 268 Ala. 1, 105 So.2d 144.

We need not explore church brawling either under the statute against disturbing public worship (Code 1940, T. 14, § 117), or under the inherent right of self help where the ejectors use no more force than necessary. See McLain v. Matlock, 7 Ind. 525, 65 Am.Dec. 746; Wall v. Lee, 34 N.Y. 141; Anno. 25 A.L.R. 508, "Homicide or assault in defense of habitation or property."

For failure to prove agency to warn off, the judgment below must be reversed and the cause there remanded.

Reversed and remanded.

On Remandment

CATES, Judge.

I.

This court, under Code 1940, T. 13, § 95, must follow the Supreme Court of Alabama insofar as matters of State law are concerned. Hence the decision reflected in (Re: Johnson v. State, 173 So.2d 824), requires us to re-examine the record with the presumption that the pastor, the Rev. Mr. Vess, while in the pulpit, was the sole [1] agent with authority to invite people out of

---

1. We use "sole" because we construe the evidence to show that the pastor undertook to disregard or distinguish the prior resolves of the Board of Stewards.

or into the congregation when assembled for worship.

■ However, the 1963 statute should control any future occasions.

Nor do we understand the Supreme Court's opinion to apply to other than the instant incorporated Wesleyan Methodist church. Certainly, before Act No. 533 of September 16, 1963, Laws 1963, p. 1146, what we know from our own denominational connections makes us very doubtful as to the inherent power of a pastor in a Presbyterian or a Baptist church to have taken upon himself alone such autocratic authority.

■ Be that as it may, we have carefully examined the remainder of the record, and, under the provisions of T. 15, § 389, are at the conclusion that there is no substantial injury to any of the rights of the defendant.

## II.

■ We do not think that the amnestying effect of the Civil Rights Act of 1964, as shown in Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300, applies here. We reach this conclusion both by way of the State and Federal Constitutions and by the *apparent* absence of any language in the Act of Congress which applies to churches in worship assembled.

■ We do not doubt that it would be, in effect, an act of establishment of religion if a given congregation were shorn of the choice to admit or exclude members or worshipers according to the duly expressed will of the group.

The judgment of the circuit court is due to be and it hereby is affirmed on authority of the Supreme Court's opinion, supra.

Affirmed.

PRICE, P. J., not sitting.

