**Gilberto T. HERNANDEZ et al.,
Plaintiffs,**

**v.**

**John D. ERLENBUSCH et al.,
Defendants.**

**Enrique GONZALES et al.,
Plaintiffs,**

**v.**

**John D. ERLENBUSCH et al.,
Defendants.**

**Civ. Nos. 72–811, 72–812.**

United States District Court,
D. Oregon.

Dec. 5, 1973.

Charles J. Merten, Marmaduke, Aschenbrenner, Merten & Saltveit, Portland, Or., for plaintiffs.

Thomas A. Huffman, Huffman & Zenger, Hillsboro, Or., for defendants.

## OPINION

BURNS, District Judge:

### INTRODUCTION

The events in August 1972 which produced this case took place in a nondescript little tavern in Forest Grove. They involved nothing more—nor less—lofty than the right of some American citizens to enjoy a bottle of beer at the tavern bar and to speak in Spanish while doing so. The fact that the case was brought is indicative that our society has made significant progress in casting off the more overt forms of racial discrimination. The actions in the tavern—and immediately outside—are, however, a sad reminder that significant racially discriminatory attitudes still remain.

These events furnish a fresh illustration of the truth uttered by President Kennedy a decade ago that " . . . this nation, for all its hopes and all its boasts, will not be fully free until all its

citizens are free." [1] Moreover, this case illustrates the difficulty inherent in judicial responses to the subtleties of racial attitudes when confined to the crude statutory implement of a damage award.[2]

## I.

### FINDINGS OF FACT

There actions brought pursuant to the provisions of 42 U.S.C. §§ 1981, 1982 and 1985 were consolidated for a court trial. At that trial, a preponderance of the evidence showed the following: The setting for both cases is the same—a community of approximately 8,500 persons in which more than 2,000 Mexican-Americans have been living for at least the last four years. The Plaintiffs in these cases are all U.S. citizens, most of them native born. Some two years ago, the Defendants Erlenbusch, owners of the Taffrail Tavern ("Tavern"), issued these orders to their bartenders:

> "You are instructed to observe the following in addition to the standard OLCC regulation . . .

> "11. Do not allow a foreign language to be used at the bar, if it interferes with the regular trade. If there should be a chance of a problem, ask the 'Problem' people to move to a table and turn the juke box up. (Use house money)."

The rationale for this policy, as explained by its formulators and enforcers, is that the tavern has many Anglo and Chicano [3] patrons, with attendant friction between the two groups caused by the dislike by some of the local white populace of the "foreigners" in their midst. According to the Erlenbusches, the tavern's owners, the language rule as carried out by them and their employees served everyone's interests by accommodating both Anglo and Chicano customers and ensuring peaceful continuance of the tavern business. The complaints concerning Spanish spoken at the bar allegedly stem from fear on the part of the white clientele that the Chicanos are talking about them. It was in this atmosphere ridden with mistrust and apprehension that the following incidents occurred:

### Civil Number 72–811

On August 23, 1972, Gilberto Hernandez and Abel and Alfredo Maldonado went to the tavern where Defendant Krausnick, the bartender, served them beer. While drinking, the three men began conversing in Spanish, their native tongue. Anglo customers, who were also sitting at the bar, were "irritated" and complained to Krausnick. She advised the Chicanos that if they persisted in speaking Spanish, they would have to go to a booth or leave the premises.

Hernandez and the Maldonados took issue with these orders and an argument ensued. Krausnick poured out their remaining beer and refused to refund any money. The police were called, the Plaintiffs left peacefully.

### Civil Number 72–812

Two days later, the scene was reenacted with different Plaintiffs and an additional three antagonists. Krausnick "pulled" the beers of Gonzalez, Perez and Vasquez who were then followed out of the tavern and assaulted by Defendants Salisbury, Dunn and Clary, three Anglo regular customers. Clary was subsequently tried and convicted in state court for battering Gonzales over the right eye with a fire extinguisher. (Gonzales was the only Plaintiff who was physically struck.)

---

1. The President's radio and television report to the American people on civil rights. June 11, 1963. *And Mr. Kennedy, at about the same time, and in a similarly striking phrase, said "The rights of every man are diminished when the rights of one man are threatened."*

2. Plaintiffs have sought no injunction in this case.

3. The terminology used by the parties throughout the proceedings denoting Caucasian and Mexican-American people, and hence used here.

Defendant Krausnick testified that she agreed with and willingly enforced "Rule 11." Clary, Dunn and Salisbury concurred, saying they knew of the rule and wholeheartedly endorsed it. John Erlenbusch testified he adopted the policy simply to avoid trouble and to preserve his license.

## II.

### CONCLUSIONS OF LAW

There is no question but that 42 U.S.C. §§ 1981 and 1982 have been interpreted to ban the discrimination alleged in these cases. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Regardless of Defendant Erlenbusch's contention that his policy is "in accordance with and because of the rules and regulations" of the Oregon Liquor Control Commission and O.R.S. 471.315(1)(d), this is clearly private discrimination, as differentiated from unequal treatment under color of state law which would be actionable under 42 U.S.C. § 1983. The applicability of 42 U.S.C. § 1985, the conspiracy statute, will be discussed later.

In examining the practical effect of the tavern's policy against the speaking of foreign languages at the bar, it is obvious that it amounts to patent racial discrimination against Mexican-Americans who constitute about one-fourth of the tavern's trade, regardless of an occasional visit by a customer able to speak another language. The rule's results are what count; the intent of the framers in these circumstances is irrelevant. See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In the instant case, Rule 11, as intended and applied, deprives Spanish-speaking persons of their rights to buy, drink and enjoy what the tavern has to offer on an equal footing with English-speaking consumers.

Plaintiffs' § 1981 rights "to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" have been violated. Likewise, Plaintiffs have been denied their § 1982 guarantee that "[a]ll citizens of the United States shall have the same right . . . to . . . purchase . . . personal property." The "property" involved in the "contract" here is a bottle of beer instead of a job,[4] a house,[5] or a ticket to a recreational activity,[6] but the principle is the same as that involved in the lunchcounter and bus cases of the 1960's.[7] Just as the Constitution forbids banishing blacks to the back of the bus so as not to arouse the racial animosity of the preferred white passengers, it also forbids ordering Spanish-speaking patrons to the "back booth or out" to avoid antagonizing English-speaking beer-drinkers.

The lame justification that a discriminatory policy helps preserve the peace is as unacceptable in barrooms as it was in buses. Catering to prejudice out of fear of provoking greater prejudice only perpetuates racism. Courts faithful to the Fourteenth Amendment will not per-

---

4. Dobbins v. International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D. Ohio 1968).

5. *Jones, supra; Sullivan, supra.*

6. Scott v. Young, 307 F.Supp. 1005 (E.D. Va.), aff'd, 421 F.2d 143 (4 Cir. 1970); cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91; Valle v. Stengel, 176 F.2d 697 (3 Cir. 1949).

7. E. g. Boynton v. Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206 (1960); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963); Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Gober v. City of Birmingham, 373 U.S. 374, 83 S.Ct. 1311, 10 L. Ed.2d 419 (1963); Avent v. North Carolina, 373 U.S. 375, 83 S.Ct. 1311, 10 L.Ed.2d 420 (1963); Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964); Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964); Boman v. Birmingham Transit Co., 280 F.2d 531 (5 Cir. 1960).

mit, either by camouflage or cavalier treatment, equal protection so to be profaned.

■ Although damages are due, I recognize that under the circumstances of this case only a modest amount should be awarded. This award cannot pretend to offset or negate the undercurrents of discrimination. As to those, I also recommend, later in this opinion, other remedial measures. Therefore, for the humiliation and distress resulting from this discriminatory policy damages are awarded against the Erlenbusches and Krausnick as follows:

a) In No. 72–811, each Plaintiff shall recover $100;

b) In No. 72–812, each Plaintiff shall recover $100.

■ Despite the common law duty of tavern owners to protect their patrons from injury in or in the reasonable vicinity of their tavern,[8] the evidence does not justify a finding that the owners or the bartender had reason to anticipate that the outside ruckus on August 25, 1972, would occur because of Rule 11.

Actually, it seems just as likely that these Anglos would have attacked the Chicanos whether a "foreign language" policy existed at the tavern or not. Since the evidence produced does not support Plaintiffs' position that Rule 11 was the inspiration and proximate cause of the assault and battery—which the rulemakers should have foreseen—there is no need to canvass the law to evaluate the validity of this theory of legal causation.[9]

■ Consequently, for the assault and battery in No. 72–812 no damages are awarded as against the tavern owners or bartender. Plaintiffs Vasquez and Perez are each awarded $100 general

al damages and $100 punitive damages as against the remaining three Defendants. Plaintiff Gonzales is awarded, as against the same three Defendants, $200 general, $49.51 special, and $250 punitive damages.

■ Although the episodes described in this opinion have passed into history, it was apparent during the course of the trial that the underlying attitudes which originally stimulated adoption of the illegal language policy are still operative. Given this continuing situation, it seems appropriate to refer this matter to the Community Relations Service established under the Civil Rights Act of 1964 [10] pursuant to the provisions of 42 U.S.C. § 2000g. The functions of this agency as they are described in the statute are:

" . . . to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States . . . whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby . . . . "

Accordingly, I am sending a copy of this opinion to the Seattle Regional Office, 210 U.S. Court House, Seattle, Washington, recommending an investigation by the agency to determine whether it could helpfully intervene. Should assistance be offered, I hope the parties will welcome and cooperate in this conciliatory enterprise.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Plaintiffs should submit a judgment.

---

8. Peck v. Gerber, 154 Or. 126, 59 P.2d 675 (1936).

9. Plaintiffs advance an interesting legal argument, citing Hines v. Garrett, 131 Va. 125, 180 S.E. 690, by analogy, for the proposition that the Defendants are liable for the

tangential results of a wrongful action (adopting the discriminatory policy).

10. This agency was transferred from the Commerce to the Justice Department under Reorganization Plan No. 1 of 1966 by President Johnson.