Ben **ACHTENBERG**, Sandra Adickes, Thomas L. Edwards, William D. Jones and Susan B. Patterson, Appellants,

v.

**STATE OF MISSISSIPPI et al.,** Appellees.

No. 22665.

United States Court of Appeals Fifth Circuit.

Feb. 5, 1968.

Goldbold, Circuit Judge, dissented in part.

---

Eleanor Jackson Piel, New York City, for appellants.

James K. Dukes, James Finch, Howard L. Patterson, Jr., Hattiesburg, Miss., for appellees.

Before TUTTLE, THORNBERRY and GODBOLD, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from an order remanding to the state courts of Mississippi charges against the appellants, Sandra Adickes, Ben Achtenberg, Thomas L. Edwards, William D. Jones and Susan B. Patterson, for the crime of vagrancy. The cases were removed to the district court on a petition that charged that the prosecution's charges of vagrancy were based exclusively on attempts by the appellants to exercise rights guaranteed them under the 1964 Civil Rights Act.

The issues for us to decide are whether these removal petitions allege grounds for removal which, if true, meet the standards set out in the case of State of Georgia v. Rachel, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966). If they do, and if the evidence adduced in opposition to remand of these cases establishes the truth of the allegations, then the order of remand must be vacated since the

State did not see fit to offer any counter testimony. Incidentally, the state has not seen fit to file a brief in this appeal.

The order of the trial court granting the petition for remand of these cases came shortly after the passage of the Civil Rights Act of 1964, but a year before the decision by the Supreme Court in the removal cases: State of Georgia v. Rachel, supra and City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).

The five cases here combined for appeal purposes are grouped into two classes. We deal first with the case of Achtenberg, Edwards, Jones and Miss Patterson, since they were all acting together at the time of their arrests. Of these four, appellant, William D. Jones, is a Negro school teacher from New York state. The other three, Ben Achtenberg, Thomas E. Edwards and Miss Susan B. Patterson were white persons associated with a project being conducted in Mississippi as the COFO Mississippi Summer Project, which is described in the removal petition as being engaged in assisting Negroes assert their civil rights in the state of Mississippi.

The removal petition in the *Jones* case contained the following allegations:

"On August 17, 1964, in the City of Hattiesburg, Mississippi, at approximately 1:00 P. M., petitioner, in company with several other COFO adherents, was engaged in the peaceful use of the facilities of the public library of said city in the same manner as other residents of said city who were then and there using said library. Petitioner is a Negro and was accompanied at said library by Negroes and petitioner alleges upon information and belief that at all times mentioned herein it was and is the official policy of said city and said library to refuse to admit and to serve Negroes at said library on an equal basis with white users of said library.

"The aforesaid conduct and activity of petitioner for which petitioner was arrested as hereinafter set forth, was

done in the exercise of rights guaranteed to petitioner by the federal constitution and statutes, including Title 42 U.S.C. 1981 et seq., and amendments thereto, and the Civil Rights Act of 1964."

With respect to the white petitioners the language is:

"Petitioner was accompanied at said library by Negroes, and petitioner alleges, etc."

The arrest of Sandra Adickes occurred at a different time several days earlier than the arrests mentioned above. Her removal petition alleges that:

"On August 14, 1964, in the city of Hattiesburg, Mississippi, at approximately noon, petitioner, in company with several other COFO adherents (elsewhere in the removal petition it is stated that COFO is an organization engaged in assisting Negroes to achieve civil rights in the state of Mississippi) was attempting to use the public library in the city of Hattiesburg, Mississippi, when she was refused service and was ordered to leave the premises by an official of the city of Hattiesburg. After peaceably complying with said order and leaving the library, petitioner and the other COFO adherents went to the Kress store in the city of Hattiesburg to purchase food, but petitioner was refused service at said store because she is white and her associates were Negroes. Thereupon petitioner and her above mentioned associates left the store and petitioner was immediately arrested by officials of the city of Hattiesburg.

"The aforesaid conduct and activity of petitoner for which petitioner was arrested as hereinafter set forth, was done in the exercise of rights guaranteed to petitioner by the federal constitution and statutes, including Title 42 U.S.C. 1981 et seq., and amendments thereto, and the Civil Rights Act of 1964."

Miss Adickes further alleges that she was arrested for vagrancy and then asserted as follows:

"At all times herein mentioned the arresting officers and other officials of the City of Hattiesburg were informed and knew that Petitioner was a white teacher regularly employed by the New York City Public School System at an annual salary of $7,200, the holder of a Master of Arts Degree from Hunter College, New York, N. Y., and that Petitioner had on her person and exhibited to said officers at the time of her arrest cash assets belonging to Petitioner and totalling ninety-five ($95) Dollars."

When the *Rachel* case was before it, this Court especially considered the application of the liberal rules of pleading as provided for under the Federal Rules of Civil Procedure to the statute relating to Removal Petitions. We there held that the liberal rule of Notice-Pleading is applicable to petitions for removal. See Rachel v. State of Georgia, 342 F.2d 336, at p. 339. We, therefore, apply this rule to consider these petitions in light of the affidavits that were subsequently filed in opposition to the petition for remand.

The affidavit of appellant Jones best describes the action that brought about the arrest of the group of four persons:

"I was born and reared in Birmingham, Alabama where I lived until two years ago. Since then, I have been living in Bellmore, Long Island, New York, where I am a public school teacher. I am thirty-eight years old, an Air Force veteran of World War II and the Korean conflict, during which I served in England, the Philippines, and Germany. I have two honorable discharges from the military services. I came to Hattiesburg as a volunteer Freedom School teacher with the COFO Mississippi Summer Project, arriving on July 4.

"On Monday, August 17, 1964, after we, in a Freedom School class, had staged and discussed several typical scenes where we were using certain public facilities and for the first time, particularly a library since some local Negro children had been dismissed and their teacher arrested at the Hattiesburg Public Li-

brary on August 14, a small group of us decided to visit the same library in quest of books pertaining to Negroes. As their teacher, I would be the leader to accompany them. Three other Freedom School teachers, all white, were to proceed ahead of us and deploy themselves as observers.

"At approximately 12:45, I entered the Hattiesburg Public Library in the company of six local Negro youth, (sic) Jerry Wilson, 17; Lee Pollard Abrams, 16; Janice Walton, 16; Shirley White, 15; Dorothy Jean Patton, 12; and Cynthia McCarty, 9. They and I entered the library very quietly and orderly. They lined up at the desk while the librarians spent some time on the telephone. When she eventually terminated the call, she came and asked the first one in the line what he wanted. He requested as well as the others in turn, a specific book pertaining to Negroes. The librarian told each one that the book requested was presently unavailable, but that she could possibly get it and have it sent to the East Sixth Street Branch where it could be claimed. The branch mentioned is the one designated exclusively for Negroes. Each child, upon hearing this, went either to book shelves or magazine racks, selected something to read and sat down. In the meantime, I asked the librarian whether that was the only place that these children could check out books, and she answered, 'Yes, that is *your* branch.' The librarian, noticing that some Negro youth had taken seats and begun to read, interrupted attending to those still waiting at the desk and went over to where Jerry Wilson was seated and asked, 'Do you intend to stay in here and read?' One answered yes, and she said, 'All right, I'll just have to call the city (police).' Then she returned to the desk and made a telephone call. In a few minutes, two other white women and a man, presumably other library employees, joined her behind the desk and talked in whispers while looking amazed at us.

"The smallest Negro child, Cynthia, was seated at the table with me and had taken a magazine on gardening. Since we were in the adult section of the reading room, the table was too tall for her. She sat majestically with her chin barely able to reach the edge of the table where she had laid the open magazine. I observed her in admiration, compassion, pity and amusement for a few minutes, then I asked her and the next older girl, Dorothy Jean, to go with me to the children's section on the opposite side of the room. We went over and I directed them to a shelf containing story books for children. Each selected a book and started to walk toward the librarian's desk with it. Just as they arrived there, two policemen entered, one of them being Chief Hugh W. Herring, who asked brusquely, 'Are those library books?' The girls answered, 'Yes,' and he ordered them harshly 'Put them back!' The girls obeyed promptly and returned with me to the side where we had first been seated. They took other magazines and began to read them. The policemen talked briefly and quietly with the library employees. One of them, Chief Herring, went directly to Thomas Edwards, one of the white observers, and began to question him, while the other, under orders of Herring, questioned the youth as to their names, ages, and addresses. They, Chief Herring and the other policemen, went to separate tables where Ben Achtenberg, and Susan Patterson, other white observers, were seated reading. They questioned them, but I could not hear the questions clearly. I saw them both produce identification papers. Chief Herring then came to the table where I was reading a *Life* magazine. He asked whether I had brought those children into the library. I said, "They are with me', and he asked, 'Are they your children?' I answered, 'In a way—just what do you mean?' He replied, 'I mean are you their father?' I answered, 'No.' He said, 'Well, if you aren't their father, what are you doing with them?' To which I answered, 'I am their teacher.' He asked, 'Do you have their parents' permission to have them with you,' and I said yes. He replied, 'Just because you are their teacher, you feel like they are

your children?' I answered, 'Yes, most teachers feel that way.' He then mimicked me sarcastically, and went to question Ben or Susan further. By this time, two additional policemen had arrived and stood around looking. Chief Herring returned to me and asked me my name. Instead of answering, I asked him, 'Why do you want to know? Am I under arrest?' He said that he had said nothing about arrest and ordered me to answer the question, which I did. Upon request of something with my name on it, I produced my membership card in the New York State Teachers' Association. Then he asked questions about my regular employment. I told him that I was employed as a teacher in the public schools of Bellmore, New York and showed him a faculty member card that certified it. He copied information from the card, then inquired further as to the particular school, its name, address, the subject and grade that I teach. I answered the question fully, having the cumbersome task of spelling out almost every word. Upon hearing that I taught French to fourth grade pupils, he laughed incredulously and derisively. Then he asked me what I was doing in Hattiesburg, and I told him that I was a Freedom School teacher. He asked me whether I was paid for this and I replied no. He then said, 'I am going to arrest you on vagrancy.' This time, I laughed, and he said, 'It's funny to you, isn't it?' and I answered, 'Yes, very funny.' He retorted, 'All of you people are funny to me * * * you make me laugh!' I asked, 'Just how can you charge me with vagrancy when I am employed?' He said, 'You aren't employed around here, you are just hanging around without means of support.' I told him that I worked last school year and that I had a contract for the coming school year, which I could show him. He ignored this and repeated that I was going to be arrested as a vagrant. Then he ordered the other policemen to arrest 'all of the out-of-state people (four) on the same charge of vagrancy, and he told them to order the children out and home.' "

The removal petitions, as supplemented by the affidavits of the other three movants of this group all show that they had adequate means for their support, both on their persons and by way of regular employment or in the case of the college student, by family financing.

The affidavit filed by Miss Adickes in her case tells the story of what happened, leading up to her arrest:

"I reside at 520 East 12th Street, New York, N. Y., 10009. I have been employed by the New York City Board of Education for the past four years. I teach English on the 10th, 11th and 12th grade levels at Benjamin Franklin High School in Manhattan. I now hold a B.A. degree in English from Douglass College in New Jersey and an M.A. degree in English from Hunter College in New York City. I earn an annual salary of $7,200.

"I have been a Freedom school teacher at Priest Creek Baptist Church in Palmer's Crossing (Hattiesburg) since July 6. The students have often discussed in and out of class the inadequacies of public facilities such as libraries and schools because they are subjected to a segregated society. Since the passage of the Civil Rights Bill, they have often expressed a desire to test the provisions of the Bill. At one point during the summer, they had planned to desegregate the Beverly Drive-in, but because of the problems of money and security, the plan was abandoned. They then decided that they would go to the public library because the library available to Negroes (Sixth Street) was so inadequate and because the Hattiesburg Library was a tax supported institution. We decided we would go on Friday, August 14.

"Jimmella Stokes, Lavon Reed, Carolyn and Diane Moncure, Gwen Merritt, Curtis Ducksworth and I took the city bus into town. We arrived at the library at about 12:10. The clerk at the desk—a blonde girl in her 20's—was on the telephone as we walked in. She winced when she saw us, hurriedly completed her call, then placed a call and asked for 'Mrs. Tracey to come up.' She asked what we wanted

and I believe Jimmella told her that we wished to take out cards. She replied that they were not issuing cards at the time and asked them if they had been to the Sixth Street Library. They told her that the Sixth Street Library did not have the books that they wanted. An older, dark haired woman came to the desk and she asked what they wanted. Jimmella repeated the request for library cards. The woman began by saying that 'I'm a Yankee and I'm sympathetic and I'm unsympathetic.' I do not remember the exact wording or sequence of her remarks but she asked them why they did not use the Sixth Street Library. They replied that Sixth Street Library did not have the books they wanted. She told them they could fill out slips and she would send the books to Sixth Street. Jimmella asked why they could not have a card at that library. The woman responded that they could not have cards because of a 'custom that began long before they were born.' I believe I said then that refusing them cards was against the law of the land. She said that she had asked the trustees to integrate the library and that they had been agreeable but the 'Council' gave them money and would withhold money if the library were to be integrated. She stated that they really did not want to use the library, that she had been at Sixth Street in July and none had come in, and a book mobile would go to Rowan (school) very shortly. Curtis said that he still could not understand why they could not have a library card. She said, 'Will you please be intelligent?' Two college boys, she said, had been in two weeks previous and when it had been explained to them that if they insisted on having cards, all the libraries would be caused to close. They had been nice, she said. They had decided it was better to keep the libraries open. Jimmella said that she still could not understand why they could not have library cards. 'Close your mouths and open your minds.' She said that she could not put them out but if they insisted on staying, she would have to call the police and close the library. Jimmella said that

if they could not use the library, she didn't think anyone else should be able to use it. The librarian asked if they were going to stay or go. I asked, 'What is your decision?' They all said, 'We'll stay.'

"We sat down at a table. There was a white man and a boy at the next table and they did not seem to be very interested in what was going on. They continued to read the materials they had at their desks. The librarian placed a call. Some of the girls got magazines and sat in lounge chairs; the rest of us sat at the table. We all expected to be arrested shortly and confided our fears to one another. Then we saw how frightened the library staff was and this lessened our fear. After about twenty-five minutes a heavy set man came into the library, approached me and asked if I were the leader. I replied, 'I'm not the leader, I'm their friend.' He said that we should all get out because they were going to close the library. He told the white people to get out. We left and waited on the sidewalk to make sure that the library would be closed. Chief Herring (Jimmella told me who he was) came out and said, 'Don't worry, they're closing the library.' We walked down Main Street, turned left on Pine Street, we went into Woolworth's intending to have lunch. The tables and booths were all filled. We walked to the back of the store and looked at the fish. We went up front again, but the one free booth was taken before we could get to it. We decided to go to Kress', noticing as we entered that a police car was parked directly across the street. Diane, Lavon, Jimmella and I sat at the booth; Curtis, Carolyn and Gwen sat at the next booth. After some minutes, a waitress approached and gave us menus. She took the girls' orders and walked away. She had not taken my order, so we called her back. I tried to get her my order and she said, 'I can't serve you.' I asked why not. She said, 'We have to serve the colored, but we're not serving white people who come in with them.' I replied that this was against the law of the land. She

said, 'Yes, we know that, but the manager told me not to serve you.' I asked the manager's name. She told me it was Mr. Powell. I asked for his first name and she said she did not know. I asked, 'Are you refusing to serve me?' She told me she was following the manager's orders. The girls told her they did not wish to be served if I could not be served.

"We left Kress' and the police car which had been waiting across the street came straight across Main Street and pulled up directly in front of us. A police sergeant got out of the car, put his hand around my arm and said, 'You're under arrest.' I asked on what charge. He said, vagrancy. I asked on what grounds I was being arrested for vagrancy. He said, 'We have orders to pick you up. Don't resist.'

"I got into the car and we drove to the city jail. The policeman who rode next to me asked, 'Are you a nigger.' I did not answer him. When we got to the station, I was booked. They asked me where I was from and what my occupation was. I told them I was a teacher in New York City. They asked me what my background was and I told them I had a BA from Douglass and an MA from Hunter. They asked me if I were working down here. I told them I earned '$7200 a year and that I did not need to work in the summer; I was on my summer vacation.' They asked my address in Hattiesburg. I said that it was 547 Mobile Street. They asked if I lived there. I replied that it was my address and I received mail there. They said, 'Oh, but you don't sleep there.' I took out the contents of my purse. I showed them that I had $20.08 in cash: a ten dollar bill, a five dollar bill, four one dollar bills, two fifty cent pieces, a nickel and three pennies. I also had thirty dollars in travelers checks and a checkbook showing a balance of over $45.00 at the

First National Bank of Hattiesburg. I asked why I was being charged with vagrancy. The arresting policeman, Sgt. Boone, I believe, repeated that he had 'orders to pick me up.' I was led to a cell."

■ These petitions for removal, together with the affidavits, clearly support the allegations in the petition that the conduct which caused the arrest of these five persons under the vagrancy statutes or ordinances of the state of Mississippi or the city of Hattiesburg, was conduct which was clearly protected under the provisions of Section 201 of the Civil Rights Act of 1964; attempts to enjoy equal public accommodations in the Hattiesburg City Library,[1] and a restaurant in the nationally known Kress store.

The utter baselessness of any conceivable contention that the vagrancy statutes prohibited any conduct in which these persons were engaged, merely buttresses the undisputed evidence before the trial court when the order of remand was entered that these protected acts constituted the conduct for which they were then and there being arrested. In the *Rachel* case, a charge of trespass under the Georgia law could comprehend acts broader than the simple refusal of a person to leave a place of accommodation because he was denied service on account of race, such, for instance, as violent or obnoxious conduct unrelated to race while on the premises of another. This, the Supreme Court held, required a factual inquiry by a federal trial court into the correctness of the allegation in the removal petition that in point of fact the trespass prosecutions were because of the racial policies of the proprietors. So, too, the factual allegation here that the comprehensive provisions of the vagrancy statute were actually being used to punish for the exercise of the rights

---

1. The evidence shows that the Hattiesburg City Library was supported by city funds and that there was a policy of restricting it to white persons. It was thus an "establishment or place" where "such discrimination or segregation is or purports

to be required by [a] law, statute, ordinance, regulation, rule, or order [of] State, agency or political subdivision thereof." 42 U.S.C.A. § 2000a–1, § 202 Civil Rights Act, 1964.

granted under the civil rights statute would normally be inquired into as a matter of fact.

There is no magic in the word "trespass" as a basis for limiting the effect of the Supreme Court's decision in *Rachel*. "Trespass" in Georgia is a broad enough charge to cover illegal entry on the property of another without regard to any questions of race or color; or it could also cover merely the refusals of a person to leave public accommodations because of a policy of racial exclusion. The movants alleged in *Rachel* that it was the latter. Thus that allegation, the Court held, asserted a ground for removal, and that allegation must be proven if challenged. So, too, the vagrancy statute may be the convenient tag for the state of Mississippi to attach to this conduct of these movants. They alleged that this was the fact. They proved it at a hearing which brought no counter proof.

█ Thus, no further hearing is required in this case.

The state of the record here calls on this court to go somewhat further than was warranted in the companion case in *Wyche v. State of Louisiana*, 394 F.2d 927, No. 24,165. This is true because here there was a hearing held by the trial court as a result of which the undisputed proof offered by appellants *demanded* a denial of the motion for remand of the cases under the principles announced in *State of Georgia v. Rachel*. In the *Wyche* case, no such hearing had yet been held and we concluded that, under *Rachel*, such a hearing was required in the district court. Here, the movants alleged in their petition for removal, *and proved on the hearing on the motion for remand*, that they were arrested for attempting to exercise the rights expressly granted them under Section 201 of the Civil Rights Act of 1964. It follows, therefore, that the judgment of the trial court granting the order of remand was error. The motion for remand should have been denied, and, on the showing

made, the evidence being undisputed that the appellants were being prosecuted in violation of the express prohibitions of Section 203 of the Civil Rights Act for rights granted them under Section 201, the trial court should then have dismissed the state prosecutions under the principle announced by the Supreme Court in State of Georgia v. Rachel.

The judgment is reversed and the case is remanded to the district court with directions that the order of remand be vacated and the prosecutions of these appellants on the vagrancy charges be dismissed.

GODBOLD, Circuit Judge (concurring in part and dissenting in part):

I concur as to all appellants except Sandra Adickes. As to her, I respectfully dissent. Factually Miss Adickes is somewhere between State of Georgia v. Rachel[1] and City of Greenwood, Miss. v. Peacock.[2] But her case is removable only if it is within *Rachel*.

The vagrancy charges against Miss. Adickes were shown to be baseless and an unsophisticated subterfuge. But that does not determine whether her case was removable under § 1443(1). The vagrancy charge against her was that she did "unlawfully, wilfully and knowingly become a vagrant by habitually loafing and loitering in idleness on the street and avenues in public places of said city [of Hattiesburg] the greater portion of her time without any regular employment and without any visible means of support."

All appellants were participants in a "freedom school" program in Mississippi. The appellants other than Miss Adickes were arrested three days after her arrest, while sitting in the Hattiesburg public library, having insisted upon their right to use it and having declined to accept use of the Negro library as a substitute. The only conduct they engaged in was the use of an "establishment or place" at which segregation was purported to be

1. 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966).

2. 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).

required by a subdivision of the state. See § 202 of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a–1. See also note 1 to majority opinion. Their cases are controlled by *Rachel*. The use of the label "vagrancy" in the charges against them instead of the label "trespass" does not require a result different from *Rachel*. The inquiry is to the scope and character of the conduct engaged in by the accused, not to categorizations, accurate or inaccurate, given to that conduct in the making of criminal charges.[3]

The case of Miss Adickes is governed by *Peacock*. Se went with six Negro students to the library to seek library service. Requests of one or more of the students to be issued cards were denied. Some of the students obtained magazines and sat in lounge chairs, others and Miss Adickes sat at a table. After about half an hour a police officer came and told all Negroes and white persons in the library to leave, that it was being closed. Miss Adickes and the students left the library, stopped outside to ascertain that it actually was being closed, walked down Main Street, turned onto Pine Street, and went to Woolworth's, intending to have lunch. The tables and booths at Woolworth's were filled. They walked to the back of the store and looked at fish, and went to the front again, but the one booth then empty was taken before they got to it. The group then decided to leave the Woolworth store and go to the Kress store. As they entered Kress they saw a police car parked across Main Street. The group went inside and were seated in booths. The Kress waitress took the orders of the Negro children but refused to serve Miss Adickes; the children said they did not wish to be served if she could not be served, and all left the store together. As they did so the police car pulled across the street and an officer alighted and arrested Miss Adickes on a charge of vagrancy.

From the removal petition and the hearing thereon it is plain that the vagrancy charge was baseless and the arrest a flagrant wrong. But—"It is *not* enough to support removal under § 1443 (1) to allege or show that the defendant's federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court." *Peacock*, 384 U.S. at 828, 86 S.Ct. at 1812. An outrageous denial of federal rights is not coterminous with a right to remove under § 1443(1). *Peacock*, 384 U.S. at 828, 86 S.Ct. 1800. As *Peacock* points out, the federal courts are not powerless to redress the wrong done to the victim of a baseless charge, and the court (384 U.S. at 828–829, 86 S.Ct. 1800) discusses some of the remedies.

For Miss Adickes removability is the wrong remedy. The Civil Rights Act of 1964 "substitutes a right for a crime." Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300, 307 (1964). Miss Adickes' conduct was broader in its scope than enjoyment of use of the library and of the public accommodations[4] at the two stores. On the particular day her presence on and movement about the streets of Hattiesburg, and into and out of the library and the stores, was close in time and in place with her efforts to use the library and the restaurant facilities of the two stores. But closeness or even concurrence is not the test—scope and quality of conduct charged to be a violation of law, measured against the four corners of conduct the exercise of which is guaranteed by the 1964 Act, is the test. There is no federal right to be a vagrant or a federal immunity from groundless arrest on a vagrancy charge.

3. Wyche v. State of Louisiana, No. 24,165, 394 F.2d 927 (5th Cir., Oct. 26, 1967). See also Judge Sobeloff, concurring in North Carolina v. Hawkins, 365 F.2d 559, 563 (4th Cir. 1966): "The test of removability is the content of the petition, not the characterization given the conduct in question by the prosecutor."

4. Section 201, Civil Rights Act of 1964, 42 U.S.C.A. § 2000a.

The petitioners in *Peacock* were civil rights workers in Mississippi. Some were engaged in getting Negroes registered as voters—they were charged with obstructing the public streets. Others alleged that while peacefully picketing they were arrested and charged with assault and battery or interfering with an officer. Others were charged with parading without a permit, illegal operation of a motor vehicle, or contributing to delinquency of a minor. Some were charged with disturbing the peace or inciting to riot. The relation of cause and effect between protected civil rights activities of the *Peacock* petitioners and their baseless arrest is not subject to rational doubt.[5] But cause and effect was rejected as the yardstick. Criminal charges are not removable on the ground they are baseless and made to punish and deter exercise of protected rights. Charges are removable if quantitatively and qualitatively they involve conduct coterminous with activity protected under the Civil Rights Act, i. e., "substitution of right for crime."

In *Peacock* the Supreme Court has directed the Federal courts away from making factual inquiries approaching that of trial of the merits as an incident of determining removability. The problem is part of the larger question of preliminary determination of whether civil rights will be denied in the courts of the state. *Rachel* carves out a narrow exception to the *Strauder-Rives*[6] doctrine. The very act of bringing the *Rachel* defendants to trial inevitably denied them their civil rights because what was charged to be criminal had been expressly made a right. Once the four corners of the *Rachel-Peacock* test are departed from the federal courts edge into exactly the factual inquiries forbidden, just as has been done in this case—is the charge "baseless"; does the

charge "arise from" exercise of guaranteed rights; is it "caused by" exercise of guaranteed rights; or, as appellants phrase it in their brief, is it "concerned with" guaranteed rights, or does arrest arise "as the result of protected conduct"; is the charge a "subterfuge"; or, as the majority phrase it in this case, did the activities of Miss Adickes to use public accommodations "trigger" her arrest? We know that Miss Adickes was not loafing and loitering in idleness on the streets the greater portion of her time without regular employment and visible means of support, but our knowledge comes from the very factual inquiry the courts are directed not to make, and not from the fact that the activity, if engaged in, is a guaranteed right which replaces a crime.

*Rachel* and *Peacock* could have significantly expanded the removal statute. Instead, *Rachel*, as adversely clarified by *Peacock*, opened the *Rives-Powers* [Commonwealth of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633] barrier only a crack: removal is now available, apart from cases where a state statute on its face denies rights, only where a federal statute on its face prohibits prosecution of specified conduct. Thus, although removal is desirable in all cases such as *Rachel* and *Peacock* in which discriminatory application of valid laws deters the exercise of federally secured rights, it remains unavailable in most such cases.

Note, 41 Tul.L.Rev. 168, 181–182 (1966).

In Wyche v. State of Louisiana, No. 24,165, 394 F.2d 927 (5th Cir., Oct. 26, 1967), recently decided by this panel, the petitioner was accused of aggravated burglary by unauthorized entry of a restaurant with intent of committing a battery. The state charge involved the totality of

5. Note the characterization of the majority opinion in *Peacock*, by the minority: "For reasons not clear, a baseless prosecution, designed to punish and deter the exercise of such federally protected rights as voting, is not seen by the majority to constitute a denial of equal civil rights."

6. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); State of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880).

activity protected by the Act plus other conduct committed at the same time and place and while engaged in the protected activity. The entire spectrum of protected activity was included in the scope of a wider spectrum of criminal conduct charged. If the federal right was removed there was no crime. In contrast, if the protected activity engaged in almost contemporaneously by Miss Adickes is removed there still can be a crime as charged.

Only recently this court has evidenced its intent to abide by the "substitution of right for crime" or "scope of conduct" test of *Peacock* despite efforts to have it move to the "causal relation" or "trigger" analysis employed by the majority. In Orange v. State of Alabama, 386 F.2d 829 (5th Cir., Nov. 22, 1967), Orange was charged with contributing to the delinquency of a minor because of his participation in marches protesting the arrests of 15 Negroes who had sought service in a restaurant and after refusal had been arrested on charges of trespass after warning. Other appellants were arrested for marching in the vicinity of the county jail to protest the arrests. Their removal petitions had been filed before *Rachel* and *Peacock* were decided. In this court these appellants asked their cases be remanded to the district court in the light of *Rachel* and *Peacock* to allow specific allegations that the purpose of their arrests and prosecutions was to punish them for attempting to secure nondiscriminatory treatment in places of public accommodation, although not necessarily at the precise time of the marches. This court refused to remand, saying that it was unwilling to extend the rationale of *Rachel* and *Peacock*. At the same time the court reversed as to the appellants who had been arrested while in the restaurant seeking service.

Factually the *Orange* appellants are further removed from *Rachel* than Miss Adickes, for she herself sought to use the library and restaurant, and her arrest was closer in time. Nevertheless *Orange* seems to me to represent the view that the *Rachel-Peacock* distinction will be

adhered to by this court. The Supreme Court has articulated the distinction and what it considers the compelling reasons for it, and I consider myself bound to apply its mandate when the facts require.