**UNITED STATES of America, Plaintiff,**

v.

**Mary June JIMICUM, Defendant.**

**No. CR–84–163–1.**

United States District Court,
E.D. Washington.

May 17, 1985.

John E. Lamp, U.S. Atty., Robert S. Linnell, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Robert B. Royal, Yakima, Wash., for defendant.

## MEMORANDUM

ROBERT J. McNICHOLS, Chief Judge.

At issue is a straightforward enough question, but one that is apparently of first impression; *viz.*, may a person be convicted of a violation of 18 U.S.C. § 495 when the amount of the check forged and/or uttered is $500 or less? The legislative occurrence giving rise to the question surrounds Congress' passage on November 14, 1983 of 18 U.S.C. § 510 which provides, in pertinent part, that the forging and/or uttering of a Treasury check with a face value of $500 or less is a misdemeanor. P.L. 98–151; 97 Stat. 976. Prior to that time, such activity was treated under 18 U.S.C. § 495 as a felony regardless of the amount involved.

Ms. Jimicum was charged with forging an endorsement on a Treasury check on May 6, 1983. A single-count indictment alleging violation of § 495 was returned on August 20, 1984. The face value of the

subject check is not set forth in the indictment, but the government concedes that the amount is less than $500. Counsel was appointed and on March 29, 1985 defendant tendered a plea of guilty.[1] As has been standard practice in this District since mid-February of 1985,[2] after eliciting an admission of the transactional events supporting all essential elements of a § 495 violation,[3] the Court advised defendant, over the government's objection, that her conviction would be treated as a misdemeanor under the provisions of § 510(c).

This memorandum is necessitated by the apparent fact that the United States Attorney for this District has not adopted any firm policy with respect to whether the appropriate charging statute in prosecutions such as this should be § 495 or § 510; but rather, allows each individual AUSA to make his own charging decision on a case-by-case basis. In some prosecutions, an election has been made to charge § 495 and prosecute on § 495, as in the instant case. In other situations, the prosecutor has charged § 495, but thereafter agreed to take a plea based on § 510. In yet other prosecutions, § 510 has been charged regardless of whether the offense occurred before or after the effective date of the statute. It would be most understandable if the United States Attorney felt his hands tied to some extent in view of the Justice Department's continuing insistence that § 510 merely supplements and does not supplant § 495. U.S. Department of Justice, *Handbook on the Comprehensive Crime Control Act of 1984 and Other Criminal Statutes Enacted by the 98th Congress* (December, 1984) 215–16. Thus, for whatever value it may be to the government in formulating future policy, or in taking this matter up on appeal, the following analysis is offered.

---

**1.** This delay was occasioned by Ms. Jimicum's apparent difficulties in finding her way to the courthouse. That is another story entirely. See *United States v. Jimicum,* CR–84–263–1 (D.C. Wa.1985) (prosecution for bail jumping).

**2.** See *United States v. Huerta,* CR–85–006–1; *United States v. Zarate-Alanis,* CR–84–246–1;

*United States v. Edmonson,* CR–84–165–1; *United States v. Knoeb,* CR–82–171–1.

**3.** The elements happen to be the same as would support a conviction under § 510, a consideration of no small importance in light of the analysis to follow.

The inquiry is three-fold: (1) has enactment of § 510 implicitly repealed § 495 insofar as the subject of forging/uttering of Treasury checks is concerned; (2) if so, would application of § 510, to the exclusion of § 495, to violations occurring prior to the effective date of the former, constitute an *ex post facto* application in derogation of Art. I, § 9, cl. 3 of the United States Constitution; and (3) if not, is retroactive application required?

## I. Implicit Repeal of Section 495

We start with a number of well-settled propositions. First, there is no lenity requirement where two or more unambiguous charging statutes are potentially available to the prosecution, and the government is free to select any appropriate predicate statute. *United States v. Batchelder*, 442 U.S. 114, 121–22, 99 S.Ct. 2198, 2202–03, 60 L.Ed.2d 755 (1979); *United States v. Ruster*, 712 F.2d 409, 411 (9th Cir.1983). Second, and conversely, "[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, [any] ambiguity should be resolved in favor of lenity." *United States v. Gann*, 732 F.2d 714, 719 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984), quoting *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *see also, Dixson v. United States*, — U.S. —, 104 S.Ct. 1172, 1177, 79 L.Ed.2d 458 (1984) (lenity "compelled" in the face of ambiguity). Third, there is no need to construe a statute when its meaning is plain on its face. *United States v. Roach*, 745 F.2d 1252, 1254 (9th Cir.1984). Fourth, and finally, while it is a court's obligation to attempt to reconcile conflicting statutes where possible, when two statutes cannot co-exist, the more specific and recent takes precedence over the more general and earlier. *Chevron U.S.A. v. Hammond*, 726 F.2d 483, 490 n. 8 (9th Cir.1984), *appeal pending*, and authorities cited therein.

Having thus set the stage in terms of controlling principles, it is necessary to examine the statutes at issue: their plain language, their history, and the interpretation placed on each by the judiciary.

Section 495 provides:

Whoever falsely makes, alters, forges, or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States or any officers or agents thereof, any sum of money; or

Whoever utters or publishes as true such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; or

Whoever transmits to, or presents at any office or officer of the United States, any such writing in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered forged, or counterfeited—

Shall be fined not more than $1,000 or imprisoned not more than ten years, or both.

Section 510 provides:

(a) Whoever, with intent to defraud—

(1) falsely makes or forges any endorsement or signature on a Treasury check or bond or security of the United State; or

(2) passes, utters, or publishes, or attempts to pass, utter, or publish, any Treasury check or bond or security of the United States bearing a falsely made or forged endorsement or signature shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(b) Whoever, with knowledge that such Treasury check or bond or security of the United States is stolen or bears a falsely made or forged endorsement or signature buys, sells, exchanges, receives, delivers, retains, or conceals any such Treasury check or bond or security of the United States that in fact is stolen or bears a forged or falsely made endorsement or signature shall be fined not

more than $10,000 or imprisoned not more than ten years, or both.

(c) If the face value of the Treasury check or bond or security of the United States or the aggregate face value, if more than one Treasury check or bond or security of the United States, does not exceed $500, in any of the above-mentioned offenses, the penalty shall be a fine of not more than $1,000 or imprisonment for not more than one year, or both.

■ The first and most obvious lesson to be drawn from a comparison of these two statutes is that § 495 is absolutely silent on the subject of Treasury checks, whereas such checks constitute virtually the sole subject matter of § 510. Is there a false conflict here in that § 495 does not even contemplate prosecutions for forging/uttering of Treasury checks? Alas, life is not so simple, for it has been settled for some fifty years now that congressional silence notwithstanding, government checks are "other writings" within the meaning of § 495. *Prussian v. United States*, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931):

> But we think the indictment is to be sustained as charging an offense under § 29 of the Criminal Code [now § 495], which punishes the forgery of "any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving ... from the United States, or any of their officers or agents, any sum of money." The indictment alleges specifically and with certainty the forgery of the endorsement on the draft, for the purpose of obtaining a sum of money from the Treasurer of the United States, and charges a violation of § 29.... The writings enumerated have no common characteristic from which a purpose may be inferred to restrict the statute to any particular class of writings. The addition of "other writing" to the enumer-

ation was therefore not for the purpose of including writings of a limited class, but rather of extending the penal provisions of the statute to all writings of every class if forged for the purpose of obtaining money from an officer of the United States.

*Id.* at 679–80, 51 S.Ct. at 224–25 (citation omitted); *see also, De Maurez v. Squier*, 144 F.2d 564 (9th Cir.), *cert. denied*, 323 U.S. 762, 65 S.Ct. 95, 89 L.Ed. 610 (1944).

By the same token, it can hardly escape one's attention that *Prussian* was not decided until 1931—some 108 years after enactment of the predecessor to § 495 in 1823. See *United States v. Staats*, 49 (8 How. 41) U.S. 41, 44, 12 L.Ed. 979 (1850). Nor can it be ignored that prior to *Prussian*, the circuits were wandering hither and yon on applicability of § 495 to forged and/or uttered government checks.[4] 282 U.S. at 680, 51 S.Ct. at 225. As this Court sees it, the significance of the fact that it took over a century to authoritatively devine congressional intent in enacting the 1823 forerunner of § 495, and such intervening versions as Congress adopted from time to time, is that Treasury checks, as that term is known today, were probably not expressly considered by Congress in the youthful years of the Nation for the same reason that regulation of the airwaves was not considered. Even Congress' detractors concede that it is upon occasion visionary, but not that visionary.

As *Prussian* makes clear, the intent of Congress was not focused on the small green negotiable cardboard instrument with the square holes punched in it which today makes its way into millions upon millions of homes and businesses each month. The focus, rather, was upon "all writings of every class if forged for the purpose of obtaining money from an officer of the United States." 282 U.S. at 679–80, 51 S.Ct. at 224–25. Thus, it was close enough for the *Prussian* Court that Con-

---

**4.** For simplicity's sake, all of § 495's predecessors will be referred to generically as § 495. There is remarkably little difference, and no substantive difference at all, between the modern-day version and its forerunners. *Compare,* *United States v. Davis*, 231 U.S. 183, 187 n. 1, 34 S.Ct. 112, 112 n. 1, 58 L.Ed. 177 (1913) *with United States v. Staats, supra,* 49 U.S. (8 How.) at 44.

gress expressed an intention to protect the public treasury from fraud occasioned by false written demands made upon it, regardless of the precise form of such writings.

Having delved into the depths of antiquity in chronicling the historical development of § 495, and having ascertained that congressional intent, finally defined after more than a century of judicial uncertainty, was to protect the government from the impact of false writings, we come to November 14, 1983, the effective date of § 510. As of that date, Congress had once again addressed the public interest in protecting the national fisc against forging and/or uttering checks drawn against the Treasury. It had considered the problem in broad scope, enhancing the penalties for violations involving more than $500, and decreasing the penalties for violations involving $500 or less. Congress had spoken authoritatively and comprehensively to the precise point at issue here—Treasury checks—something it had never done before.

It bears noting that Congress did not merely determine that henceforth, forging and/or uttering of Treasury checks with a face value of less than $500 would be a misdemeanor. Rather, the treatment was comprehensive, the subject-matter discrete, and perhaps most significantly in terms of congressional intent that § 510 should be the sole charging statute for such offenses,

the penalties for transgressions involving checks with a face value in excess of $500 were actually *increased.*

■ Given this scenario, the Court sees no basis for further dissecting, exploring, interpreting, or divining congressional intent in enacting § 510. The statute speaks for itself. *United States v. Roach, supra,* 745 F.2d at 1254. It must be concluded that this is manifestly a situation in which, with respect to § 495, "Congress [has left] to the Judiciary the task of imputing to Congress an undeclared will." *United States v. Gann, supra,* 732 F.2d at 719. Now that Congress has declared its will in the form of § 510, the resultant conflict between these two statutes must be resolved in favor of lenity. *Id.; see also, Dixson, supra,* 104 S.Ct. at 1177.

Alternatively, it cannot be, in light of the history set out above, that it is Congress' intent that these two disparate penal provisions co-exist. This conclusion is supported not only in light of the foregoing authorities, but also with reference to what limited legislative history exists addressing § 510. As the Senate Judiciary Committee noted in *S.Rep. No.* 98–225, 98th Cong., 1st Sess. (September 14, 1983), *reprinted in,* 1984 *U.S.Code Cong. & Ad.News* 3182: [5]

With respect to the forging of endorsements on United States securities, violations involving forgery of endorsement or fraudulent negotiation of a Treasury

---

5. The Court concurs with the government that this Report, while not dealing directly with P.L. 98–151, is good authority in relation to § 510. The Report was prepared in consideration of S. 1762, 98th Cong., 1st Sess. (1983), entitled the Comprehensive Crime Control Act of 1983. In actuality, the substance of that proposed legislation did not find its way into law in its entirety until 1984. See Comprehensive Crime Control Act of 1984, P.L. 98–473; 98 Stat. 1837.

In the waning days of the 1st Session, however, Congress did enact, after substantially modifying and incorporating into one section; *i.e.,* § 510, what was referred to in the Report as sections 510 and 511. The Court attaches no adverse significance whatever to the fact that § 510 was enacted in substantially modified form from that which was reported out. If anything, the streamlined final version, which has deleted the potentially confusing preoccupation with "securities of the United States," focus-

es attention even more clearly upon Congress' intent to deal squarely and exclusively with the subject of forged endorsements on Treasury checks.

Nor can the Court accept the government's reading of the Report as indicative of congressional intent that § 510 was to be supplemental to § 495. It is true that the rationale underlying passage of § 510 was to cure a situation in which certain activity of a criminal nature managed to slip through the cracks of § 495; a fact which is not surprising since § 495 was never intended to deal with Treasury checks in the first place. How this observation supports the government's position; or how it obviates manifest congressional intent to treat all offenses involving Treasury checks under one broad section which expansively and comprehensively defines both offenses and appropriate penalties, is not at all clear.

check or bond or other security of the United States are sometimes successfully prosecuted under 18 U.S.C. 495. *That statute was not, however, drafted to deal specifically with government obligations, but instead expressly covers deeds, powers of attorney, and contracts.* The basis for using section 495 to prosecute violations with respect to government securities is the provision therein which punishes the forgery or alteration of "other writings". 18 U.S.C. 471 and 472 are concerned specifically with forgery and uttering of forged obligations or securities of the United States. However, these sections apply to forgery of the security, not forgery of endorsement.

Because section 495 was not drafted to deal with obligations of the United States, many of the variations of offenses involved with the forgery of obligations are not included within that section and cannot otherwise be prosecuted under Federal law. For example, it is currently possible for a thief to steal a Treasury check endorsed by a payee, endorse his own name and obtain the proceeds, and not violate section 495. In addition, it is possible for a thief to steal one or more government checks or bonds from the rightful owner and sell them to a middle man and not violation [*sic*] section 495.

### 2. Provisions of the bill, as reported

Part D would add a new section 510 to title 18, United States Code, proscribing the making, uttering, or possession of a counterfeited or forged security of a State or political subdivision thereof, or of an organization, with intent to deceive another person, organization, or government. It would also penalize the making, receipt, possession, sale or transfer of an implement designed or particularly suited for the making of a counterfeit or forged security with the intent that it be so used. In either case, a convicted offender would be liable for imprisonment of up to ten years and a $250,000 fine.

The section also contains elaborate definitions of the terms "counterfeited",

"forged", and "security", as well as "organization" and "State". The first three definitions are taken from the counterfeiting and forgery subchapter of S. 1630, the Criminal Code reform legislation approved by the committee in the 97th Congress, and the Committee Report thereon should be consulted.

Part D would also add a new section 511 to title 18, United States Code, to proscribing [*sic*] the forging of any endorsement or signature on a security of the United States, or the passing, uttering or publishing of any such security bearing a forged endorsement or signature, with the intent to defraud. Section 511 would also penalize whoever buys, sells, exchanges, receives, delivers, retains, or conceals a stolen United States security or one that bears a forged endorsement or signature knowing that the security is stolen or bears such an endorsement. Violations would be punishable by up to ten years in prison and a $250,000 fine, *except that if the face value of the security did not exceed $500, the offense would be punishable as a misdemeanor* by imprisonment of up to one year and a fine of $1,000. The term "forge" is defined in a manner substantively identical to its definition in the preceding section. The term "security" is defined to incorporate the definition in the preceding section as well as an "obligation of the United States", a term defined in 18 U.S.C. 8.

This proposal would make it possible to prosecute both forgeries of endorsement and related crimes involving obligations of the United States *under one section.* *Id.* at 371–72, *U.S.Code Cong., supra,* at 3512–13 (emphasis added).

In light of this legislative history, the government's reliance on decisions such as *United States v. Jones,* 607 F.2d 269 (9th Cir.1979) is misplaced. *Jones* is unquestionably mandatory precedent, but it is also readily distinguishable. Faced with a parallel problem in which more than one charging statute was arguably applicable, the Court first strongly reiterated the general rule:

We have encountered a number of situations where certain conduct is proscribed by more than one statute. The rule we apply is straightforward: "where an act violates more than one statute, the Government may elect to prosecute under either unless the congressional history indicates that Congress intended to disallow the use of the more general statute."

*Id.* at 271 (citations omitted).

The *Jones* Court then proceeded to hold both the specific and the general statutes under scrutiny to be valid and concurrently available to the prosecutor at his election.[6] In large measure, the rationale prompting such determination was that the general statute, which stated a felony, required a showing of specific intent. The more specific misdemeanor statute did not. "Thus, there exists a rational statutory framework in which the degree of punishment corresponds to the presence of specific intent." *Id.* at 274.

In the instant case, if there is any meaningful distinction between § 495 and § 510 in terms of either the acts proscribed or the requisite *mens rea*, it is an extremely elusive one. Both deal with the same subject-matter, albeit only by virtue of judicial construction in the case of § 495, and both are specific intent crimes. If the existence of a "rational statutory framework" affords the appropriate test, as held in *Jones*, there is nothing rational about disregarding a clear and unambiguous congressional statement of intent issued in 1983 in favor of a vague and generalized intent formulated in 1823. On the contrary, the legislative history surrounding § 510 provides the sort of "affirmative evidence" of legislative intent that takes the instant case out of the *Jones* rule. 607 F.2d at 273.

Thus, notwithstanding the disfavor with which implied repeal is viewed, this is a classic example of a conflict which should be resolved by giving effect to the more recent and specific enactment at the expense of the older and more general. *Chevron U.S.A. v. Hammond, supra,* 726 F.2d at 490 n. 8. Whether viewed as a question of lenity or of implicit repeal, any supposition that the prosecutor has discretion today to make an election as to whether to charge § 495 or § 510 with respect to any offense involving the forging and/or uttering of a Treasury check occurring after November 14, 1983 approaches the fatuous.

## II. *Ex Post Facto Application*

Having concluded that § 510 is the sole charging authority for offenses committed after the effective date of the statute, however, does not answer the question of whether treating offenses under that provision which were committed prior to the effective date, but not charged until after that date, would be an impermissible application of an *ex post facto* law. To put matters in perspective, let us set the stage by assuming the following scenario. The accused is charged with forging a government check with a face value of less than $500 on November 13, 1983. That's Count I. He is also charged with uttering the same check on November 15, 1983. That's Count II. The prosecutor, reasonable fellow that he is, files a two-count information charging two § 510(c) violations, and at the pretrial conference, the following exchange ensues:

Defense: If it please the Court, I will move for dismissal of Count I on the basis that the effective date of § 510 was not until one day after my client allegedly forged the check at issue.

Prosecution: Fine with me, Judge. I'll just go before the grand jury and seek a bill charging § 495.

Court: Counsel, are you sure this motion is in your client's best interest?

Defense: The protection of a defendant's constitutional rights is always in

---

**6.** That supposed concurrent availability tends to be somewhat illusory. The penal provisions of the misdemeanor statute under consideration in *Jones* had previously been declared void for vagueness. *United States v. Diaz,* 499 F.2d 113 (9th Cir.1974). Thus, had the *Jones* Court come down on the other side of the coin, for all practical purposes, there would have been no charging statute at all.

his best interest. Clearly, the government is attempting to prosecute my client on a charge which did not even exist when the activity alleged was performed, all in violation of Art. I, § 9, cl. 3 of the United States Constitution.

If the foregoing strikes the reader as somewhat improbable, perhaps a little absurd, how much more strained is it for the *prosecution* to raise such an argument. Of all the authorities read by the Court in connection with the instant issue, no case has been uncovered in which it was the government which raised an *ex post facto* question. This is probably with good reason, since from the seminal decision of *Calder v. Bull*, 3 (3 Dal. 386) U.S. 305, 1 L.Ed. 648 (1798), to the most recent Supreme Court pronouncement, the test for characterizing an ex post facto application has been simple and unvarying:

> [O]ur decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.

*Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981).

■ Whether we consider the hurdle facing the government to be one of standing, or even assuming standing, that the government could not demonstrate any detriment to the defendant, the focal point of inquiry remains the same. Neither the defendant nor the prosecution can be heard to complain of an Art. I, § 9, cl. 3 violation where no detriment can be shown. It can hardly be said that an accused's ability to be tried on, or plead to, a misdemeanor as opposed to a felony constitutes a detriment.

This is not the sort of case where the activity complained of was lawful at the time of performance and thereafter declared unlawful. On the contrary, it has been unlawful since at least 1823, and has remained unlawful at all times in the 162 years since then.[7] Nor can it be said that the penalties have been increased in a manner detrimental to an accused. Indeed, § 510 decreases such penalties, both in terms of the amount of potential fine and imprisonment, and even more significantly, in terms of the moral disapprobation attached to a conviction.

### III. Retroactive Application

■ Finally, we come to the core issue at stake. Assuming that the foregoing analysis is correct, and that § 510 has implicitly repealed § 495, or alternatively that the doctrine of lenity compels application of the former to the exclusion of the latter, and assuming further that retrospective application would not violate Art. I, § 9, cl. 3, is there any constitutional bar to charging § 510 for conduct proscribed under § 495 but committed prior to November 14, 1983? It would appear not. *Matter of Reynolds*, 726 F.2d 1420, 1422 (9th Cir.1984). But is such retroactive application required; and perhaps more to the point, is it within the power of this Court to require it? It must be conceded, with some reluctance, that the confidence with which this memorandum has been approached thus far begins to erode at this juncture; for while there may be no bar of constitutional dimensions, there is a seemingly insurmountable statutory obstacle in the form of 1 U.S.C. § 109:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

It is the hallmark of virtually every published decision addressing § 109 that the historical development underlying the statute be treated at some length. At the risk of breaking with tradition, such background will be examined here only in summary form. "At common law, the repeal of a criminal statute abated all prosecu-

---

7. At least this appears to have been the rule in most circuits. The question was not authoritatively addressed until *Prussian, supra.* See text at page 1533, *supra.*

tions which had not reached final disposition in the highest court authorized to review them." *Bradley v. United States,* 410 U.S. 605, 607, 93 S.Ct. 1151, 1154, 35 L.Ed.2d 528 (1973). Perhaps curiously, one of the most expansive treatises on the general subject of retroactivity ever penned by the Supreme Court makes no mention of § 109, but does quote with approval the following commentary:

> "Because this was a criminal prosecution [*United States v. Chambers,* 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934) ], it builds not only upon the cases which followed [*U.S. v.*] *Schooner Peggy* [1 Cranch 103, 2 L.Ed. 49 (1801) ] but also upon the principle, established at common law, that repeal of a penal statute prohibits prosecution of acts committed before the repeal if those acts had not yet been prosecuted to final judgment. The repeal is regarded as an indication that the state no longer wants such acts punished, regardless of when they took place, and no longer views them as criminal." Note, 71 Yale L.J. 907, 914 (1962).

*Linkletter v. Walker,* 381 U.S. 618, 626 n. 9, 85 S.Ct. 1731, 1736 n. 9, 14 L.Ed.2d 601 (1965).

It was in response to this common law principle of abatement that Congress enacted the forerunner of § 109. *Hamm v. Rock Hill,* 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964):

> The federal savings statute was originally enacted in 1871, 16 Stat. 432. It was meant to obviate mere technical abatement such as that illustrated by the application of the rule in *Tynen* [*United States v. Tynen,* 78 (11 Wall.) U.S. 88, 20 L.Ed. 153 (1871) ] decided in 1871.

*Id.* at 314, 85 S.Ct. at 390.

*Hamm* then went on to virtually stand the language of § 109 on its head, suggesting that notwithstanding the use of the term "express" in the statute, the courts were free to draw an inference, within the context of a given act, that if Congress had intended a pending action *not* to be subject

to abatement, it would have said so. *Id.* at 313–14, 85 S.Ct. at 390–91.

The Ninth Circuit took *Hamm* at face value in *United States v. Stephens,* 449 F.2d 103 (9th Cir.1971), in a factual situation analogous to the instant matter, by holding, in effect, that the function of a savings statute is to avoid allowing an offender to skate completely free on a technicality. A "technical abatement," as that term was used by *Hamm,* held the *Stephens* Court, occurs only when a repealer statute is replaced with an enactment containing more onerous sanctions. At common law, the repealed statute could not be charged, nor could the replacement statute in view of *ex post facto* prohibitions. *Id* at 105 n. 6. So construed, suggested the *Stephens* Court, § 109 does not preclude utilization of an ameliorative sentencing scheme which becomes effective after criminal conduct has been charged, but before judgment.

Rarely has an appellate court opinion been subjected to so much harsh criticism, for it appears that the complement of the Supreme Court, together with its jurisprudential outlook, had undergone a significant shift since *Hamm. Stephens* was overruled in *Bradley, supra.* Just in case anyone missed the point, *Stephens* was again castigated in *Warden v. Marrero,* 417 U.S. 653, 660 n. 11, 94 S.Ct. 2532, 2536 n. 11, 41 L.Ed.2d 383 (1974). The Ninth Circuit has had occasion only three times since then to address § 109: once in *White v. Warden* discussed at note 11 *infra*; once in a very collateral sense when an abatement argument was raised, but not reviewed on procedural grounds;[8] and once in a civil context which affords no assistance in the instant case.[9]

Nor, for that matter, has there been much judicial activity on the subject anywhere in the Nation in recent years. Those few reported decisions in which § 109 has reared its head frequently tend to involve *sui generis* topics which allowed the courts treating those matters a much freer hand than may be available to this Court under

---

8. *United States v. Spawr Optical Research, Inc.,* 685 F.2d 1076, 1078 n. 2 (9th Cir.1982).

9. *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir.1985).

the facts at bar. Perhaps oversimplified, those post-*Marrero* decisions which have been published may be broken down into three broad categories: (1) those which have embraced a strict, technical, and literal approach in applying § 109 with undeviating harshness;[10] (2) those which have adopted a considerably more flexible approach based on the totality of the circumstances surrounding a given piece of legislation;[11] and (3) those which have not really taken a stance on the role of § 109 in modern-day statutory construction, but which at the same time, have exhibited remarkable creativity in avoiding that precise question.[12]

While not all of the foregoing address the scenario of the instant case where an ameliorative sentencing scheme was enacted between the time of the commission of the acts giving rise to the offense and the time of conviction, these cases do adequately reflect the panoply of judicial thought currently prevailing on the general topic of the wisdom of allowing a pro forma congressional recitation to vitiate what has historically been a basic tenet of the common law; *viz.*, that when society no longer believes an act to be criminal, the act should no longer be subject to sanctions.

Given the mellowed and often creative judicial approaches embraced in recent years, it is difficult to accept the proposition that *Warden v. Marrero, supra,* has written the last word on the subject. It is equally difficult to accept the proposition that the all-encompassing recitation contained in § 109 should serve to preserve a felony conviction, with its attendant moral opprobrium and collateral consequences, for an offense which would be only a misdemeanor if committed today. This is particularly distressing in view of the legislative history of § 495, which would seem to indicate that the inclusion of forgery/uttering of Treasury checks into that charging statute was judicially created, and that the first time Congress expressly and explicitly considered such activity in comprehensive terms, it was deemed to be only a misdemeanor when the amount at issue did not exceed $500. It becomes even more distressing in light of the observation that an entirely plausible and consistent view of

**10.** *See, e.g., Weatherington v. Moore,* 577 F.2d 1073, 1075 (6th Cir.1978); *United States v. Cahalane,* 560 F.2d 601, 606 (3rd Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Mikelberg,* 517 F.2d 246, 254 (5th Cir.1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1104, 47 L.Ed.2d 313 (1976); *Widdis v. United States,* 395 F.Supp. 1015 (D. Alaska 1974).

**11.** *See, e.g., White v. Warden,* 566 F.2d 57, 61–62 (9th Cir.1977) (applied § 109 in conjunction with four other factors to find non-retroactivity, but left open possibility of "implied retroactivity" notwithstanding § 109); *Frey v. United States,* 558 F.2d 270, 273–74 (5th Cir.1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978) (relied on § 109 but only after finding specific savings clause coupled with explicit statutory language of prospectivity); *Brown v. United States Civil Service Comm'n,* 553 F.2d 531, 534 (7th Cir.1977) (remanded to court below with directions that *Hamm, supra,* was dispositive as to non-applicability of § 109); *United States v. Blue Sea Line,* 553 F.2d 445 (5th Cir.1977) (repeal of criminal statute and replacement with penal civil sanctions deemed "procedural" in nature and thus not affected by § 109); *Barthelemy v. Ray McDermott & Co.,* 537 F.2d 168, 171 (5th Cir.1976) (§ 109 will not operate to save pending actions when a jurisdictional statute is repealed); *United States v. Me-*

*chem,* 509 F.2d 1193 (10th Cir.1975) (congressional intent of retroactivity may be implicit rather than express thereby rendering § 109 inapplicable); *United States v. Azevedo,* 394 F.Supp. 852 (D.Haw.1975) (relied on *Mechem, supra,* and reached same conclusion).

**12.** *See, e.g., Nogueira v. United States,* 683 F.2d 576 (1st Cir.1982) (refused to consider government's § 109 argument on procedural grounds); *United States v. Koger,* 646 F.2d 1194, 1196 n. 3 (7th Cir.1981) (unnecessary to reach § 109 issue since statute was expressly prospective only); *In re Adamo,* 619 F.2d 216, 222 n. 10 (2nd Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980) (premature repeal of statute was "mistake" which court would not give effect to); *Cayuga Indian Nation of New York v. Cuomo,* 565 F.Supp. 1297, 1327–329 (N.D.N.Y.1983) (alternative basis for action other than repealed statute); *United States v. Provenzano,* 423 F.Supp. 662 (S.D.N.Y.1976) (§ 109 inapplicable to statute which had been repealed in response to judicial finding of unconstitutionality; on theory that since the penalty under the repealed statute could no longer be constitutionally imposed, all that remained of the repealed statute was procedural in nature and thus not subject to § 109).

congressional intent in ameliorating the penalty for a relatively minor transgression, was that of pursuing the enlightened objective of gearing the sanction to the crime.[13]

### IV. Conclusion

It is the government's position that the Court lacks authority to, in effect, amend the indictment so as to state only a misdemeanor rather than a felony. It is argued that the only options open are to either accept the plea as tendered to the indictment as charged, or to dismiss the indictment for failure to state a crime. As should be apparent from all which has preceded, the Court is disinclined to embrace the first choice. Nor is the second option particularly viable, because the plain fact of the matter is that the indictment does state a crime in light of the indistinguishability of § 495 and § 510 in terms of elements. The only significant difference between the two lies in the penalty. There is a third alternative, and it is to be found in *Kniess v. United States*, 413 F.2d 752 (9th Cir.1969).

Having determined Kniess was not subject to indictment under 18 U.S.C. § 472, we must consider whether, despite reference to section 472, the Washington indictments nevertheless alleged sufficient facts to charge a violation of section 500.... Each of the three Washington indictments contains the following language:

"That * * * JOHN EUGENE KNIESS, with intent to defraud, did knowingly and unlawfully pass, utter and publish * * * a falsely made, forged and counterfeited obligation and security of the United States, to wit, a falsely made, forged and counterfeited * * * Postal Money Order."

Clearly, the language charges Kniess with knowingly passing a forged postal money order, an act prohibited by section 500. While the indictments made no reference to the specific knowledge described in section 500, they do charge that Kniess possessed an intent to defraud. This, as we have previously explained, is synonymous with the required knowledge which is specified in section 500. We therefore conclude that each of the indictments alleged all the elements necessary to state an offense under 18 U.S.C. § 500.

*Id.* at 759 (citations omitted); *see also, Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir.1970).[14]

■ For the foregoing reasons, defendant's conviction will be deemed a misdemeanor for all purposes, and judgment will be entered accordingly.

---

**13.** *Cf., S.Rep. No.* 98–225, *supra* at 1–2; *U.S.Code Cong., supra,* at 3184–85. Given the government's representation that § 510 was proposed by the Department of Justice, an equally plausible rationale for such proposal might lie in the observation that the criminal process tends to be expedited when a prosecutor can hold the stick of a felony conviction in one hand and the carrot of a misdemeanor conviction in the other. The intent we are concerned with, however, is that of Congress, not the Administration's, and a court should be reluctant indeed to ascribe such a motive to the legislature. Certainly no such intent may be inferred here in the absence of any supporting legislative history.

**14.** Some might question the value of fifteen-year old case law in light of the rapidity with which decisional developments occur today. While the cases cited appear to be the most recent

vintage available from the Ninth Circuit on direct point, an application of parallel principles lends support to their continuing vitality. Analogizing to those decisions addressing the function of an indictment where conviction of an unstated lesser included offense is a possibility, it is apparent that an indictment which adequately apprises the accused of the *factual* allegations against which he must defend is constitutionally sufficient. See *United States v. Gooday,* 714 F.2d 80, 81–82 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 884 (1984). If a defendant is automatically on notice that he must be prepared to meet any lesser included charge, then it is difficult to see how it could be at all objectionable to convict Ms. Jimicum of § 510(c) when the elements are precisely the same as those set forth in the indictment.